Argued February 1; reversed March 6, 1934

# MORRISON *v.* PACIFIC NORTHWEST PUBLIC SERVICE CO.

## (30 P. (2d) 344)

*Cassius R. Peck,* of Portland (Griffith, Peck & Coke, of Portland, on the brief), for appellant.

*William P. Lord,* of Portland (Lord, Moulton & Krause, of Portland, on the brief), for respondent.

BAILEY, J.   This action was brought by the plaintiff to recover damages from the defendant for injuries suffered by plaintiff, a passenger on defendant's street car, while alighting therefrom, caused by plaintiff's slipping on some foreign substance on the floor of the front vestibule of the car.   From a judgment in favor of the plaintiff the defendant appeals.

Defendant assigns as error the denial by the court of its motion for a directed verdict in favor of defendant on the ground that there was no evidence which tended "to support the proposition that the defendant or its employees had any notice or knowledge" of the presence of the foreign substance (presumably a fresh plum and hereinafter to be referred to as such) on the floor of the front vestibule of the street car prior to the accident, or that it had been there a sufficient length of time for defendant's employees to be charged with notice or knowledge of its presence.

The plaintiff, together with his companion, Foley, boarded the street car on August 5, 1931, between ten-thirty and eleven p. m., at the ball park on Twenty-fourth and Vaughan streets in Portland, at the conclusion of a night baseball game. Plaintiff and Foley were about the last to board the car and there was then no accommodation for passengers except standing room in the front vestibule. The route of the car was from the ball park to Twenty-third street, thence south to Washington street, east to Nineteenth street, south to Morrison street and east along Morrison street to its intersection with Thirteenth street, approximately one mile and a half from the ball park, where it stopped at the signal of Foley to allow him and plaintiff to leave. During the trip plaintiff and his companion had, as other passengers were discharged, managed to work their way inside the car, where they stood, hanging to the straps, until immediately prior to leaving the car. When the car came to a stop plaintiff's companion left the car first and reached the street in safety, but as plaintiff was about to alight his foot came into contact with the fruit, lying on the floor within three or four inches of the outer edge of the platform, causing him to slip and fall upon his back or

side, striking either the edge of the platform or the top step, with resulting injuries which are the basis of this action.

The car on which the plaintiff was a passenger was being operated, at the time of the accident, by one man only, known as a motorman-conductor. Passengers entered and left the car at the right front, through a vestibule approximately six feet by three and one-half to four feet. The motorman was stationed in the center front of the vestibule, about three feet from the outer door. That door was kept closed, except when opened to admit or discharge passengers. Its opening automatically operated a switch controlling an electric globe above the door, lighting the steps and platform. At other times the vestibule was dark.

On the evening of the accident this particular car was being used as a "special" or "tripper" and at about nine-thirty o'clock that evening the motorman started to take it from the car-barn some four blocks distant from the ball park. In preparing to take the car on its run the motorman was obliged to pass through the doors at both ends of the car several times. The defendant's cars are cleaned and swept at least every night. At the time the loading began at the ball park there was no foreign substance of any kind in the vestibule or interior of this car.

The plaintiff was one of the last passengers on, and at the time he boarded the car the floor of the front vestibule was free of any foreign substance, especially any plum. In this respect he testified:

"Q. Did you notice anything on the floor there when you got on?

"A. No, sir; I didn't.

"Q. And as you stepped on to the car, stepped into the car, the floor would be right in front of your eyes here, wouldn't it?

"A. Yes, sir.

"Q. Was there anything on the floor there when you got on?

"A. No, sir."

Several disinterested witnesses testified that there was no foreign substance on the floor of the vestibule when they boarded the car at the ball park. No witness saw the plum or knew of its presence on the floor until after plaintiff's mishap.

When the plum was picked up from the floor after the accident, the floor was stained with the fresh juice of the fruit for an area estimated in testimony as "from five to seven inches across". Plaintiff's trousers, which were introduced in evidence, bore a stain on the right hip, of irregular shape, approximately four by five inches.

The plaintiff saw the fruit, in the motorman's hand, and it then looked to him "like crumpled-up banana peeling", "like an old banana peeling, one that was overripe". His companion testified that: "There was a soft substance, looked like a banana peeling, or could have been a plum." "It was black and slippery looking; it was soft looking." "It didn't look very fresh." "It was squashed out flat and . . . it was a fairly good sized handful, a dark, soft-looking substance, some kind of fruit." "It was smashed out rather flat and as if somebody had stepped on it, evidently as he did."

The witness Anderson, a high school boy, in referring to the fruit said: "Well, there was a spot on the floor and a prune seed right in the center of it." "It was just a fresh spot." "It looked like it was just fresh. It wasn't dirty . . . and the juice was still showing there. It hadn't soaked into the boards. The seed was wet."

The witness Carlson, another high school student, saw the fruit on the floor. He stated: "It looked to be a fresh fruit and it had been terribly mashed as he stepped on it." "It looked as though it was fresh fruit and had just recently been stepped on." "There was juice there, also a pit."

When the plaintiff was injured the motorman helped him to the sidewalk and called a cab for him. Later the motorman returned to the street car, when he saw the fruit for the first time. In testifying he was not certain whether he had picked the plum up from the floor or some one else had and handed it to him. While the plum was in his hand he and several passengers examined it. Asked to describe the condition of the fruit, he said: "Well, it was a fresh plum, with the seed still inside the plum, mashed down on that, on the seed, with the seed exposed." Relative to the moisture on it, he remarked: "Well, as much moisture as you would expect from a fresh plum smashed like that after you had done it."

Another occurrence on this trip, according to the testimony of plaintiff and his companion, Foley, was the slipping or stumbling of a woman passenger while alighting from the street car about midway between the ball park and the place where plaintiff was injured. On direct examination the plaintiff, upon being asked whether or not anything unusual happened "in or around the front vestibule on the trip", replied:

"Well, there was a woman getting off,—I don't know—she was on Twenty-third street, I couldn't say just where. I think it was some place around Glisan street—and as she got off she either slipped or fell, or something, but she didn't seem to hurt herself or anything, and the motorman left his controls and asked her if she was hurt or anything and she says, 'No', and went on. * * *

"Well, I just noticed that she slipped off of the car, or stumbled—I don't know which she done."

On cross-examination the following testimony was given by the plaintiff:

"Q. * * * Now, do you say she slipped, or stumbled? Do you know what she did up there?

"A. I don't know whether she slipped or stumbled.

\* \* \* \* \*

"Q. Did you see what she slipped on?

"A. No, sir, I didn't notice. I thought she just got on—maybe on account of high heels or something, maybe it was on account of that. I didn't pay much attention to it. She wasn't hurt or anything.

\* \* \* \* \*

"Q. Well, then you don't know whether she slipped on anything that was on the vestibule floor or not, do you?

"A. I really don't, for I didn't see her. What I mean, I seen her fall and she jumped up and run off. She wasn't hurt or nothing.

\* \* \* \* \*

"Q. Now, you had just as good a chance to see whether there was anything on the floor at that time as the motorman did, didn't you?

"A. Yes, sir.

"Q. You didn't see anything on the floor?

"A. I didn't. No, sir."

The witness Foley, referring to this matter, testified as follows:

"Q. What, if anything, did you see occur on the street car before you went into the body of the car?

"A. There was a lady that stumbled or slipped, stumbled, and the motorman went over and asked her if she was hurt, and she just shook her head and walked on.

\* \* \* \* \*

"Q. The car was full of people then, when the woman fell?

"A. Yes, sir.

"Q. And there were people standing here in the vestibule when the woman fell?

"A. It was all filled up. There wasn't room for any more.

\*      \*      \*      \*      \*

"Q. Well, I am asking you, did you see anything on the platform?

"A. No, sir.

"Q. You had just as much chance to see anything that there was on the platform as the motorman, didn't you?

"A. Yes, I could, because he couldn't see there either.

"Q. He couldn't see there either?

"A. No; there was too many people there.

\*      \*      \*      \*      \*

"Q. And was there anything to prevent him [the motorman], if he had wanted to, from having looked to see what the condition of the step was at that time?

"A. Well, there was a lot of people there, standing in the vestibule. I don't think that he would have very much view of the floor, because it was so crowded that we could hardly stand in there and the lady could hardly get through."

Foley also testified that he did not see the woman passenger slip or stumble and did not know whether she fell from the vestibule or top step or from some other step, but that she was "in a stumbling position" when he saw her.

The incident relating to the woman passenger was emphatically denied by the motorman and was denied by disinterested witnesses. It is, however, plaintiff's contention that in passing upon defendant's motion for a directed verdict the evidence must be considered most favorably to the plaintiff, a proposition not contested by the defendant; that the jury might infer from the

testimony of plaintiff and his companion Foley that the woman passenger, while alighting from the car, had slipped on the same plum which later caused plaintiff's injury; and that the motorman was negligent in not, at the time of the woman passenger's mishap, discovering and removing this foreign substance. This matter will be discussed later in the opinion.

One of the first questions encountered in passing upon the defendant's motion for a directed verdict is whether the transportation company is, in an instance of this kind, charged with the highest degree of care for the safety of its passengers, or only with ordinary care. In other words: Is the doctrine of the maxim *res ipsa loquitur* applicable to some casual or temporary condition which is encountered in the operation of a system of transportation, over which the carrier does not have exclusive control, such as the deposit of some foreign substance on the floor of a car by a passenger, or must the person seeking to hold the transportation company liable for injuries sustained by reason of such condition allege and prove that the company had knowledge of such condition, or because of certain facts should have known, and did not remedy the same?

In *Heck v. Northern Pacific Railway Co.*, 59 Mont. 106 (196 P. 521), the plaintiff while alighting from a train was injured when her foot slipped as she stepped on a "step box" placed by the brakeman in proper position on the platform to enable passengers to embark and alight conveniently. The cause of her accident was a small piece of ice which became lodged on top of the box after it had been placed in position by the brakeman. The trial court granted defendant's motion for an involuntary nonsuit, and in affirming the

judgment appealed from, the supreme court of Montana very clearly outlined the duties of a public carrier, as follows:

"The doctrine of the maxim *res ipsa loquitur* is applied to passenger cases to this extent: Whenever the injury results from some vice or defect in the appliances or operative mechanism of the means of transportation or from the movement of trains, proof of the injury and the cause of it raises a presumption of the carrier's negligence, as where the injury results from the overturning or derailment of a coach or the collision of trains. The reason for the application of the rule in such cases has its foundation in the fact that the instrumentalities of carriage are within the exclusive control and management of the carrier, whose duty it is to know that they are in proper condition to render the service required by law, whereas the passenger is without the means of ascertaining the presence of defects which cause the injury, or, if he should know of them, he is ordinarily in no position to avoid the consequences. The following cases illustrate the rule [citing many authorities].

"The right to recover for personal injury is grounded in negligence, and the burden of pleading and proving negligence is upon the injured party. Whenever, therefore, the injury results from something over which the carrier has not exclusive control, the rule of ordinary negligence obtains, and the burden is upon the passenger to show that the presence of the cause of the injury is attributable to the carrier's negligence. Speaking generally, the doctrine of the maxim *res ipsa loquitur* can not, from the very nature of the case, have any application to injuries received by a passenger while alighting from a standing train. Knuckey v. Butte Electric Ry. Co., 41 Mont. 314 (109 P. 979)."

In *Bassell v. Hines*, 269 Fed. 231 (12 A. L. R. 1361), the plaintiff was a passenger on a pullman chair car. In leaving the car she stumbled over a hassock or foot-

stool. The trial court charged the jury, among other things, as follows:

"If the hassock got into the aisle of the car through the action of a passenger, it was then incumbent upon the plaintiff, in order to establish negligence upon defendant's part, to show by a preponderance of evidence that the hassock was there a sufficient length of time for the defendant's employees, in the exercise of ordinary care, to have discovered and removed it."

The jury returned a verdict in favor of the defendant, and on appeal the plaintiff contended that the lower court erred in not charging the jury that the defendant "was bound to exercise the highest degree of care and prudence consistent with the conduct of its business". The appellate court in passing on the question there presented observed:

"The stricter rule imposing the more extreme liability is the one which expresses the duty of a common carrier as to all the special perils of transportation. The cases to this effect are familiar. Some of them are cited in the opinion of this court, in Memphis v. Bobo, 232 Fed. 708, 711, 146 C. C. A. 634. The leading cases and the textbook discussions indicate (see Indianapolis Co. v. Horst, 93 U. S. 291, 296, 23 L. Ed. 898) that the reason of the rule is that the passenger delivers himself into the custody and control of the carrier, that he is helpless against these perils, and that he is compelled to, and rightly does, rely upon the carrier for protection. This reason extends to and supports the great bulk of the cases where the rule of the highest practicable care has been enforced. * * * All of these agencies were peculiar to the instrumentality of transportation, and their proper management and control, so that they would not harm a passenger, were wholly in the hands of the carrier.

"Plainly, the reason of the rule does not extend to those comparatively trifling dangers which the passenger meets while upon a railway car only in the same way and to the same extent as he meets them daily in

his home or in his office or on the street, and from which he easily and completely habitually protects himself. He may, more or less excusably, stumble and fall over a footstool or chair in his home, or an obstacle on the sidewalk, or a hassock in a car; he need never do any of these things, if he takes sufficient care. It did not need evidence to show that these hassocks were under the control of the passengers, and were by them placed and replaced as they desired; and this destroys the basis—sole management and control—for the extreme rule. There is, in our judgment, no sound reason why anything more than ordinary care, fitted to the circumstances, should be required, nor why the rule of highest practicable care should be applied to such a subject; we do not find any controlling authority, or any weight of authority, which so requires.''

The court discussed a number of other decisions and the instruction above quoted, and then remarked:

''It is argued that the burden should have been put upon the defendant to show that the hassock, in this contingency, had not been there long enough to raise the inference of negligence. There was, in truth, no affirmative evidence whatever that the hassock had been in an obstructive position for any length of time or to dispute the porter's evidence that the aisle was clear a moment before when he passed out, and it might, therefore, be said that it made no difference where the burden of proof was, as there was nothing to show negligence, and a verdict for defendant should be instructed (as was held in Colburn v. Chicago Co., 161 Wis. 277, 152 N. W. 821, and Kantner v. Philadelphia Co., 236 Pa. 283, 84 Atl. 774, and as the court below thought on the motion for new trial); but it is not necessary to decide that proposition. There is no basis for plaintiff's position in this respect, unless in the doctrine of *res ipsa,* etc.

''The burden is always upon the plaintiff to show negligence, and only when the occurrence itself indicates negligence can the burden be thought satisfied and shifted to the other side. Since it is, as a matter of common knowledge, much more probable that such a

situation as an obstructing hassock is caused by a passenger than that it is caused by an employee, it might well be thought that the doctrine *res ipsa* can not apply to such a case; but that question, also, we need not decide.''

The early case of *Stimson v. Milwaukee, L. S. & W. Ry. Co.,* 75 Wis. 381 (44 N. W. 748), involved a passenger who tripped over a satchel in the aisle of a passenger car. The lower court granted defendant's motion for an involuntary nonsuit, and on appeal the judgment of the trial court was affirmed. In answer to the appellant's contention that proof of the accident raised a presumption of negligence on the part of the carrier, the court said:

''The rule stated in these cases is that there must be reasonable evidence of negligence, but where the thing (meaning the thing which causes the injury) is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen, if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care. In the case at bar the thing which obstructed the passage in the car was evidently the personal baggage of some passenger, and not a thing exclusively under the control or management of the employees of the company; and so the mere fact that it was in the aisle or passage-way of the car at the exact time of the accident does not, of itself, raise a presumption of negligence on the part of the employees of the company. There may be a duty on the part of the employees of the company to remove the personal baggage of passengers from the passage-ways of the cars, but, in order to make it their duty to act, there must be evidence showing, or at least tending to show, that such employees had notice of such obstruction being in the aisle or passage-way, or that it had remained there so long before the accident that, in a reasonably vigilant discharge of their duties, they could

have discovered the obstruction before the accident happened, and failed to remove it. * * * All we have, therefore, is the one fact that, at the exact time of the accident, these satchels were in the aisle, and that plaintiff fell over them, and was injured. The personal baggage of passengers is not 'a thing under the management of the defendant and its servants,' within the meaning of the rule stated in the cases above cited; and it therefore becomes necessary for the plaintiff to show, by other proofs, that the company or its servants were guilty of some negligence or want of ordinary care in regard to these satchels. It seems very clear that there is no evidence tending to prove such negligence. There is no evidence showing, or tending to show, how long these satchels had been in the aisle. It is just as reasonable to suppose that some passenger had placed them there after the train had stopped at New London as to suppose that they had been placed there before it stopped. The presumption would rather favor the conclusion that they were placed there after the train had stopped, and while the employees were performing their duty outside of the car, for the reason that negligence is not presumed, and, if they had been there before the train stopped, they would have been seen by the employees, or some of them, and removed from the aisle. Negligence can not be predicated upon a state of facts which is as consistent with the exercise of care as it is with negligence.''

In *Livingston v. Atlantic Coast Line R. Co.*, 28 Fed. (2d) 563, the plaintiff slipped on a banana peel in the aisle of a passenger train. From a judgment entered on a directed verdict for the defendant, plaintiff appealed, and the judgment of the lower court was affirmed. The appellate court, after reviewing many decisions relating to the duty of common carriers, held that there was no evidence from which the jury could infer that the defendant was negligent, and that the mere presence of a banana peel on the floor did not raise a presump-

tion of negligence. The case of *Burns v. Pennsylvania R. Co.*, 233 Pa. 304 (82 Atl. 246, Ann Cas. 1913B, 811), also relied upon by plaintiff in the appeal here before us, is discussed by that court in the course of its opinion in the following language:

"It draws the distinction between cases where a passenger is injured by something done or left undone by carrier, or its employees, in connection with the appliances of transportation, or in the conduct and management of the business relating thereto, on the one hand, and cases in which the passenger is injured by some neglect or omission on the part of the carrier in some other respect. In the first class of cases, the burden of proof is upon the carrier to show that such injury did not result from its negligence. In the second class of cases, there is no presumption of neglect on the part of the railroad company, and the burden of proof is upon the plaintiff to show by evidence that the carrier was negligent.

"The passenger in the Burns case, as in the Long case, was injured by stumbling over a suit case placed in the aisle, which he could not see because the train was passing through a tunnel. There was evidence that the conductor and porter had passed through the car while the baggage was standing in the aisle. The court held that a dress suit case belonging to a passenger was not an appliance of transportation under the above rule, and that the duty of caring for it rested primarily upon the passenger. The negligence, if any, in the case, was that the employees of the railroad company did not discover and remove the baggage which obstructed the aisle. 'The mere fact that the personal baggage of a passenger is in the aisle of a car at the exact time of the accident does not of itself raise a presumption of negligence on the part of the employees of the railroad company.' "

In *Proud v. Philadelphia & Reading Railway*, 64 N. J. Law 702 (46 Atl. 710, 50 L. R. A. 468), the plaintiff

slipped on some foreign substance on the step of a passenger train, presumably deposited there by another passenger. In referring to the duties of a railway company, the court there observed:

"A railroad company has two means of informing itself as to the condition of the cars of one of its trains: First, inspection made while the train is at rest, by persons assigned to that service; and, secondly, the cursory and current observation of those members of the train crew whose duty requires them to be on and in the cars while the train is in motion, and who are expected as they go about their business, to have an eye to their surroundings. Inspection, to be valuable, must be thorough and deliberate. The observation that the conductor and brakeman on a moving train may reasonably be relied on to make is necessarily incidental to the performance of other duties, and so is less exhaustive than regular inspection. This being the scope of the defendant's obligation to inform itself as to the condition of this train, it is evident that there was an obstacle to the plaintiff's recovery. The defendant had duly performed its duty of formal inspection, and there was no evidence to show that, in the brief interval that had elapsed since the inspection was made, either the conductor or any one of the brakemen had been so situated, in the discharge of his duties, that observation would have disclosed to him the presence of this substance upon these front steps of the car in which Mrs. Proud was a passenger. The platform and steps were in themselves unobjectionable. Their condition had been inspected and approved within half an hour."

In one of the earlier decisions relating to injuries suffered from falling on a banana peeling, *Goddard v. Boston & M. R. Co.,* 179 Mass. 52 (60 N. E. 486), Mr. Chief Justice Holmes, later of the supreme court of the United States, disposed of the question tersely: "The banana skin upon which the plaintiff stepped and which caused him to slip may have been dropped within a minute by one of the persons who was leaving the

train. It is unnecessary to go further to decide the case.''

In *Casale v. Public Service Co-ordinated Transport,* 10 N. J. Misc. 611 (160 Atl. 326), the supreme court of New Jersey, in reversing a judgment for plaintiff, said:

''It would appear that the banana peel was observed on the floor of the bus by another passenger before the accident happened, but during the course of the trip; just how long before or at what distance from the point in the trip where the accident happened does not appear. The defendant's proofs established that there had been an inspection of the bus by the driver before the trip began, and that at that time anything on the floor was removed and thrown out. The banana peel was presumably dropped by some passenger on this particular trip.

''Upon these facts we think the case is controlled by Proud v. Philadelphia & Reading R. R. Co., 64 N. J. Law 702 (46 A. 710, 50 L. R. A. 468), and Hunter v. Public Service Railway Co., 105 N. J. Law 300 (144 A. 305). There was no proof of knowledge in the driver of the presence of the peel on the floor, nor was there proof that it had been there for such a length of time as to impute notice to the driver.

''The company is not required to keep up a continuous inspection. The driver of the bus, after the trip began, had other duties demanding his constant attention, and the presence of a banana peel, dropped by a passenger in the course of a trip, unless reasonable opportunity of inspection during the trip were afforded, could hardly be sufficient to charge the defendant with negligence. It was so held in Palmer v. Pennsylvania Co., 111 N. Y. 488 (18 N. E. 859, 2 L. R. A. 252), and Riley v. Rhode Island Co., 29 R. I. 143 (69 A. 338, 15 L. R. A. (N. S.) 523, 17 Ann. Cas. 50). We think the case should have been controlled by the court and a verdict directed in favor of the defendant.''

In *Louisville & N. R. Co. v. O'Brien,* 163 Ky. 538 (174 S. W. 31, Ann. Cas. 1916E, 1084), the plaintiff

slipped on a banana peeling on the step of a passenger coach on leaving the train. The court there refers to and discusses a number of cases as to the duty of a common carrier toward its passengers wherein the distinction hereinbefore mentioned is pointed out. The opinion then continues:

"Since it has not been shown that any of the appellant's servants knew of the presence of the banana peel upon the steps, or that it had been there such a length of time before the accident happened as would impute notice to them, we are of opinion the peremptory instruction asked by the appellant should have been given."

See, in this connection, the following cases: *De Velin v. Swanson* (R. I.), 72 Atl. 388 (banana peel on floor of store); *Davis v. South Side Elevated R. R. Co.*, 292 Ill. 378 (127 N. E. 66, 10 A. L. R. 254) (banana peel on stairway leading to station); *Hotenbrink v. Boston Elevated Ry. Co.*, 211 Mass. 77 (97 N. E. 624, 39 L. R. A. (N. S.) 419) (tobacco spit on car step); *Rhodes v. Houston E. & W. T. R. Co.* (Texas), 242 S. W. 263 (banana or other fruit on platform); *Thomas v. J. Samuels & Bro., Inc.*, 47 R. I. 206 (132 Atl. 8) (banana peeling in elevator); *O'Neill v. Boston Elevated Ry. Co.*, 248 Mass. 362 (142 N. E. 904) (apple in aisle of car); *Long v. Atlantic Coast Line R. Co.*, 238 Fed. 919 (suit case in aisle of car); *Akin v. Chicago & N. W. Ry. Co.*, 21 Fed. (2d) 1000 (snow on steps of passenger coach); *Meyer v. Michigan Central Ry. Co.*, 180 Mich. 516 (147 N. W. 485) (snow and ice on platform of passenger coach).

In the case of *O'Neill v. Boston Elevated Ry. Co.*, supra, the plaintiff testified that she "slipped on a dirty piece of apple core—black—" "A woman assisted me to my feet and pointed at the time to it, the black apple core * * * It looked black." The

court held that there was no evidence as to the length of time the apple core had been in the aisle and that its color was no evidence on that point, citing numerous cases. The court further stated that the case there under consideration was distinguishable from *Anjou v. Boston Elevated Ry. Co.*, 208 Mass. 273 (94 N. E. 386, 21 Ann. Cas. 1143).

The Anjou case is relied upon by the plaintiff here, in support of its contention that the condition of the plum was some evidence of the length of time it had remained on the floor of the vestibule. In the Anjou case the plaintiff, while walking on the platform of the defendant company, slipped on a banana peel. In referring to that incident, the court there said that the foreign substance was described by several who examined it, in the following terms: it "felt dry, gritty, as if there were dirt upon it", as if "trampled over a good deal", as "flattened down, and black in color", "every bit of it was black, there wasn't a particle of yellow", and as "black, flattened out and gritty". As a further distinguishing feature of the case the court pointed out that: "It was one of the duties of employees of the defendant, of whom there was one at this station all the time, to observe and remove whatever was upon the platform to interfere with the safety of travelers. These might have been found to be the facts."

In the later case of *Mascary v. Boston Elevated Ry. Co.*, 258 Mass. 524 (155 N. E. 637), the plaintiff while descending a flight of stairs leading to the Central Square station, slipped on a banana peel, which was described as dark or "black as tar", "dry", "a little dry skin, very black", and "it was smoothed down, * * * soft * * * as if something had been pressed on it". The court held that there was no evidence of negligence on the part of the defendant, and

that the banana skin might have been dropped a moment before by a stranger to the defendant corporation or might have come on the stair without fault of the defendant. The opinion further stated: "Additional factors tending to show negligence of the defendant present in *Anjou v. Boston Elevated Ry. Co.* [supra] distinguish that case from the case at bar."

The plaintiff in *Thomas v. J. Samuels & Bro., Inc.,* supra, stepped on a banana peel, which was described as "partly discolored", "dark", "almost black", "crushed looking", and was further described by the only person who touched it as "wet" and "soft". In referring to the Anjou case, the supreme court of Rhode Island there said:

"The Anjou case, as authority that the jury may conclude from color and appearance that the skin has been some time on the floor, is distinguished in a recent Massachusetts opinion prepared by the same justice. O'Neill v. Boston Elevated Ry. Co., 248 Mass. 362, holds in reference to an apple core that its color furnishes no evidence as to the length of time it has been there and cites with approval the earlier case of Goddard v. Boston & Maine Railroad, 179 Mass. 52 * * * ."

We shall take up and discuss briefly some of the other authorities relied upon by plaintiff. In *Gegere v. Chicago & N. W. Ry. Co.,* 175 Minn. 96 (220 N. W. 429), the court held that the accumulation of snow and ice on the steps of the train, and the condition of the weather at the time of the accident, might be "such as to indicate a negligent delay in its removal" and that it was a question for the jury to decide whether or not the defendant was negligent.

The accident complained of in *Herbert v. St. Paul City Ry. Co.,* 85 Minn. 341 (88 N. W. 996), happened on a cold, blustery morning. Two days previously 2.8

inches of snow had fallen. The court there held that these facts were sufficient to put the defendant company on its guard.

In *Hall v. Southern Ry. Co.*, 162 S. C. 260 (160 S. E. 584), the plaintiff was riding on an excursion train and there was some testimony that the defendant knew that it was customary for the passengers to eat bananas and throw the peelings on the floor on such occasions. The court said: "A reasonable inference to be drawn from the testimony in the case at bar is that a banana peel in the aisle of a passenger coach is not an unexpected peril, but is an expected peril and danger, especially on an excursion train, such as the train in question in this case  *  .*  *." Therefore, the opinion continued, it was a question for the jury to determine, in the light of the facts, whether or not the defendant was negligent.

The principal question involved in *Rea v. Southern Pacific Co.*, 105 Cal. App. 559 (288 P. 151), was whether or not the plaintiff was guilty of contributory negligence.

An employee of the defendant in *Murphy v. North Jersey Street Ry. Co.*, 81 N. J. Law 706 (80 Atl. 331, 35 L. R. A. (N. S.) 592), testified that he swept such snow and ice off the steps as he was able to do with a broom. There was evidence that the steps were covered with a solid sheet of ice, overlaid with snow. The controversy there was whether or not the defendant corporation was negligent in regard to cleaning the steps properly.

In *Hartford v. Boston Elevated Ry. Co.*, 280 Mass. 288 (182 N. E. 476), the plaintiff was injured by slipping on ice in the interior of the street car. There was testimony that the ice was "frozen very hard",

"packed down into the corrugations", "frozen right in the crevices", "frozen in the corrugations of the car", "down in between the grooves, and part of it was protruding up". A small piece of ice which was kicked out of the floor with difficulty was "heavy and was imbeded with little pieces of sand and gravel". The court held that in view of the foregoing testimony it was for the jury to decide whether or not the ice had been there a sufficient length of time for the employees of the company to know of its presence.

■■ There is no evidence in the case at bar showing or tending to show that the accident to plaintiff was caused in any way by defendant's negligence. Before the defendant can be held liable for the injuries suffered by the plaintiff, it is incumbent on plaintiff to prove that defendant's servant, the motorman-conductor, knew that the plum was on the floor of the vestibule prior to plaintiff's injury and failed to remove it, or that it had been there a sufficient length of time for the jury to infer that the defendant's employee knew or should have known of its presence. This the plaintiff failed to prove. The plum on which plaintiff slipped might have been dropped by another passenger a moment before Morrison stepped on it. When the street car left the ball park, some 10 or 15 minutes before the accident, the plum was not on the floor of the vestibule. The car was crowded so that only standing room was available, and was in charge of only one man, the motorman-conductor, who had many duties to perform. There was nothing about the appearance of the crushed plum to indicate that it had been on the floor any considerable length of time. In fact, at most it could have been there not exceeding the period of time required for the street car to go from the ball park to Thirteenth and Morrison streets.

The testimony of the plaintiff and his companion, Foley, concerning the incident of the woman passenger's "slipping or stumbling" while alighting from the street car furnishes no basis for an inference that she slipped on any foreign substance on the floor of the front vestibule.

The trial court, on the record in this case, should have granted defendant's motion for a directed verdict in its favor, and by its failure so to do that court committed reversible error. The judgment appealed from is therefore reversed and the cause remanded with instruction to the circuit court to set aside the judgment appealed from and to enter judgment in favor of the defendant.

RAND, C. J., BEAN and CAMPBELL, JJ., concur.