HAROLD POE v. ILLINOIS CENTRAL RAILROAD COMPANY, Appellant.
—73 S. W. (2d) 779.

Division Two, June 19, 1934.

*Watts & Gentry* for appellant; *E. C. Craig* and *V. W. Foster* of counsel.

*Louis E. Miller* and *Charles A. Lich* for respondent.

510

COOLEY, C.—Plaintiff was injured by stumbling and falling, as he claims, over a pile of gravel in defendant's switchyard at East St. Louis. He sued for damages alleging negligence on the part of defendant. He recovered judgment for $9150, from which defendant appealed. Both parties were engaged in interstate commerce and the action was properly brought under the Federal Employers' Liability Act. There are several specifications of negligence in plaintiff's petition but the case was submitted to the jury on only one, viz., that defendant knew or in the exercise of ordinary care could and should have known of the presence of said pile of gravel, which was in plaintiff's pathway as he performed his work and of the presence of which he was ignorant, in time to have warned him thereof and negligently failed to do so. Defendant by its answer denied the alleged negligence and also pleaded in bar a settlement and release by plaintiff of any claim he may have had. By reply plaintiff assailed the validity of the release on the ground that his signature thereto was procured by the fraud and misrepresentation of defendant's claim agent, that he did not and could not read it and did not know it was a release. That issue was submitted to the jury. Defendant contends that the evidence was not sufficient to justify its submission, also that there was no evidence of negligence on defendant's part, for both of which reasons the court should have sustained its demurrer to the evidence and directed a verdict in its favor.

Plaintiff worked at night, his working hours being from seven P. M., to seven A. M. The accident occurred about four o'clock in the morning of December 18, 1928. Plaintiff was a car oiler, his duties being to go along the side of a train when made up in the yard and put oil and packing, "dope" as he called it, for lubrication in the journal boxes at the ends of each set of car wheels. He carried a bucket containing materials and a light which he said did not give "any big light" but was sufficient to illuminate the journal box when directed upon it so that he could see to open and fill it. The yard was unlighted at the place where he was injured. There were fifteen or sixteen tracks in the yard, running north and south parallel to each other. On the occasion in question a train, No. 78, had been made up on track 5. Plaintiff was working on the east

side of that train. He had begun at the south end and was working toward the north. Another oiler, Earl Richard, worked with him on the same side and two others worked at the same time on the west side. Plaintiff testified that when he had gotten "some twelve or fifteen car lengths up the track" (from the south end) and had finished packing a journal box, "I picked up my dope bucket and went to turn around, and fell over a pile of rock on the east side of track number 5 where I was working. . . . There was about two or three bushels of rocks there, some of them large and some of them small—sand and stuff. I never stopped to examine the pile of stuff that I stumbled on; it looked like there was everything in it." Elsewhere in his testimony and in his instructions he referred to it as a pile of gravel. For convenience we will so call it. He said he did not see it and had no knowledge or warning of its presence till he fell over it; that his left leg about two inches below the knee struck the end of a cross-tie. His evidence tends to show that the injury caused osteomyelitis. Two or more operations were performed and the wound was still exuding pus when suit was filed. No point being made that the verdict is excessive the injury need not be further detailed.

G. W. Sweet, a witness for plaintiff, testified: "On or about the 16th day of December, 1928, I had occasion to be in what is known as the old yards in East St. Louis, and on that day I crossed over tracks 4 and 5 early in the morning, possibly 7:30 or 8 o'clock. I merely noticed a pile of gravel—a small pile of gravel between track 4 and track 5. It seemed as though it was closer to track 5 than it was to 4. I should judge it was 12 or 15 car lengths from the north end of track 5. I should judge there was three or four bushels of gravel in the pile."

There was no evidence tending to show that defendant or any of its agents or servants had actual knowledge of the presence of the pile of gravel at or about the place in question. Sweet's testimony above quoted was the only evidence offered to show its presence there prior to the time plaintiff stumbled over it.

For defendant, Richard testified that he was working with plaintiff and was proceeding about two-thirds of a car length ahead of him when he heard a bucket or something fall and an exclamation, "Oh," from plaintiff, and asked plaintiff what was the matter and plaintiff said he had fallen over "this damn pile of rock" and hurt his leg; that he, Richard, thereupon went back to plaintiff but saw no pile of rock or gravel "or anything unusual." He said there might have been "a little gravel, coal or such as that fell off a car which you frequently see in the yard;" but he did not recollect seeing anything of the kind. The two oilers who worked on the west side of the train saw no rock or gravel but it is not shown that they were on the east side any time that night. They did not learn of plaintiff's

fall that night. Two car inspectors whose duties, they said, took them along both sides of the train, testified they saw no rock or gravel on either side.

On the question of the release, plaintiff's testimony was in substance that he is wholly illiterate, unable to read or to recognize even the simplest words and unable to write, except to sign his name, which he does, as shown by exhibits in the record, very poorly; that in his childhood he attended school irregularly for a few years, his schooling aggregating less than the equivalent of one whole year, and reached about the third grade; did not study much and had forgotten what little he had learned. He testified that some time in 1929 after he had had at least two operations on his leg at defendant's hospital at Chicago and had made frequent trips there for treatment, defendant's claim agent, Purkhiser, met him in Chicago and asked him if he needed a little money, to which he replied that he did but that "I wasn't ready to settle on my leg;" that his leg was still in bad condition; that there was some talk about settlement and Purkhiser said he would give him two or three hundred dollars if he wanted to settle, but he was not ready to settle; that he understood "settling on it" to mean settling so that he "would be through with it and never have any more claim," which he was not ready to do; that he next saw Purkhiser at Fulton, Kentucky, where Purkhiser came to see him. Relative to this meeting he testified:

"He called me over to Mr. Howard's office, a claim agent. He still talked settlement on it. I don't just remember everything he said about it. He asked me when I was going to be able to go to work, and I told him I didn't know when; that my leg wasn't well and I wasn't able to work on it, and I wasn't ready to make no settlement on my leg at all. He said something about that he might give me half time, or something like that, until my leg got able to go to work. We were talking about wages. We were not talking about settlement then. I didn't understand that he was making an offer to settle with me then. He wasn't then. He didn't say anything about settling then; he just said he would give me half time, or something like that, up to date, so I told him I wasn't ready yet to go to work; that my leg wasn't able or nothing. Dogged if I remember whether I told him in that conversation before or after he said he would give me half time that I was not ready to settle. I don't remember. I don't believe he said anything in that conversation about settling with me for my leg. I volunteered the statement to him that I was not ready to settle for my leg because I thought he might have meant settlement or something like that. He didn't say he would settle with me. He told me that he would give me half time or up until date, and so I told him I was not ready yet to go to work or anything. I might have told him at the same time that I was not ready to settle."

Plaintiff's next meeting with Purkhiser was on the occasion when the alleged settlement was made. Purkhiser sent him a pass to come to East St. Louis which he did, arriving on January 31, the day before the date of the release. Plaintiff said that Purkhiser got on the train at Carbondale and between there and East St. Louis told plaintiff he would stop the train and they would get off at the division office in East St. Louis and see Mr. Bishop, not telling him why they were to see Bishop and that he himself did not know why; that nothing was said on the train about settlement. It appears that Bishop had charge of the employment of men working in the capacity in which plaintiff had worked. According to plaintiff's testimony, when they arrived at Bishop's office plaintiff, at Purkhiser's direction, waited in an outer room while Purkhiser had a brief conference with Bishop. The latter then came out and had a short conversation with plaintiff. Bishop asked him if he was able to go to work, to which he replied that he was not and asked Bishop if he had any light work for him. Bishop said: "No, sir. When you are able to go to work you will have to report for your job in the yards as an oiler." Bishop then left the room and Purkhiser came in. Plaintiff testified that this conversation then occurred between him and Purkhiser, no one else being present:

"Well, he asked me—he come in and said, 'What are you going to do?' I says, 'What do you mean?' He says, 'I mean are you going to settle this case?' and I says, 'No, sir, I ain't going to settle this case, Mr. Purkhiser,' and he says, 'Why?' I says, 'Well, my leg ain't able to go to work on it, and it ain't well, and I am still under medical treatment,' and, he says, 'Well,' he says, 'This ain't no settlement on your leg this is just your wages up to date under the Compensation, and you have to sign a receipt before you can go back to work,' and I says, 'Well, that would be all right,' and so he told me that he would draw up some papers and figure up how much and for me to meet him the next morning at Missouri Avenue.

"Q. What were your wages when you were working for the company just before you quit to go to the hospital? A. Four dollars and something I think.

"Q. A day? A. Yes, sir.

"Q. Well, now, that was the first time that Mr. Purkhiser had said a word about Compensation instead of settlement, wasn't it? A. No, sir, he said something at Fulton about it to me.

"Q. But in all the other conversations he had asked you whether you were ready to settle, hadn't he? A. He might have said something to me about it.

"Q. Yes. And there in Mr. Bishop's office he asked you if you were ready to settle this case, you said that, didn't you, before he spoke of Compensation, he said, 'Are you ready to settle this case.' A. Yes, sir.

514

"Q. And you understood that, didn't you, if you told him you were not ready to settle, didn't you? A. Yes, sir.

"Q. All right. And then you say he switched to the subject of Compensation? Just what did he say about Compensation? A. Well, he told me this wasn't settlement on my leg, it was my wages up to date under the Compensation; that I would have to sign a receipt before I returned to work, and when my leg got better, why, they would fix up the rest of it."

Plaintiff testified that Purkhiser directed him to meet him at ten o'clock next forenoon at "Missouri Avenue at East St. Louis, over the First National Bank;" to go to the third floor and wait when he got off the elevator, which he did, meeting Purkhiser there in the hall at the appointed time; that Purkhiser took him to the office of defendant's East St. Louis attorneys where, in a room in the office with, at first, no one else present, the following occurred, quoting from the record:

"Q. What conversation occurred between you and Mr. Purkhiser there? A. Well, we didn't talk anything about it; he just got me to fill out some papers.

"Q. About what? A. He told me to—pushed it around there and told me to sign it, and that was my receipt, that I had to sign that before I could go to work.

"Q. Is that all he said? A. Yes, sir.

"Q. Was anybody present when that occurred? A. Well, there was two fellows when I signed it. I didn't know who they were.

"Q. Mr. Purkhiser called them in? A. Yes, sir.

"Q. Would you know their names if you would hear them again? A. No, sir, I wouldn't.

"Q. I believe you said yesterday it was one of those men that went downstairs with you to get your draft cashed? A. I think it was.

"Q. Yes. And they were present now when you wrote your name down on whatever you wrote it on, on that occasion, were they? A. Yes, sir.

"Q. Did Mr. Purkhiser read that paper to you? A. He started to read it and he said, 'Well, this don't amount to nothing anyhow.'

"Q. He said that in the presence of those other two men? A. I don't know whether they was in there or not.

"Q. Did he explain to you what it was for? A. No, sir.

"Q. He didn't say that in the presence of either one of those other men? A. I don't think so.

"Q. He didn't tell you what was in the paper that you signed? A. I don't think so.

"Q. Now, isn't it a fact, Mr. Poe, that after those gentlemen came in there and just before you signed Mr. Purkhiser told you that that that—read the release to you and told you that that was a full

and complete settlement of all claims against the company? A. Well, sir I don't think he did.

"Q. Didn't he tell you that in the presence of those two men you referred to? A. No, sir, I don't think he did.

"Q. Why do you say you don't think he did? Are you in doubt about what he said? A. Well, sir, I don't think he said that.

"Q. You would not say positively that he did not, would you? A. Them men didn't come in there until we—I got ready to sign that.

"Q. That is the time I am talking about, when you were ready to sign, when he laid the paper down for you to sign. A. No, sir.

"Q. He didn't say anything about that? A. No, sir.

"Q. And didn't read it to you? A. No, sir.

"Q. And neither of them read it to you? A. No, sir.

"Q. Neither of them explained to you that it was a settlement, or asked you if you understood it was a full settlement? A. No, sir."

Elsewhere in his testimony plaintiff said that the release was never read or explained to him and that he did not know or suspect that it was a release. Upon his signing the release plaintiff was given a draft for the $850 and one of the attorneys who had witnessed his signature went with him to the bank below and identified him to the bank officials. He cashed the draft, taking twenty-five dollars in cash at the time and depositing the balance which he later drew out and used. He did not consult an attorney nor, as we understand his testimony, discover that he had signed a release until about the time this suit was filed, June 23, 1930, after he had again seen Bishop for the purpose of being put back to work and had been informed by the latter that he had been "canned" and his name was no longer on the payroll.

Purkhiser, for defendant, denied having made any misrepresentations or having said anything to plaintiff about wages or "compensation" under the Illinois or any Workmen's Compensation Law or that he told plaintiff the paper he signed was merely a receipt. His testimony was to the effect that plaintiff fully understood that he was settling his whole claim and was in no way misled. He testified that the release was read and explained to plaintiff before the latter signed it and that plaintiff expressed himself as understanding it and being satisfied with the settlement, as did both the attorneys who witnessed the signature.

■ I. We take first the question of the release. On this issue we think plaintiff made a case to go to the jury. His testimony was positive and steadily adhered to that he could not read, that the release was not read to him, that he did not know and was not informed that it was a release and that he was deceived and misled into believing that it was merely a receipt by the misrepresentations of defendant's agent which, if plaintiff's evidence is true, were

fraudulently made for the purpose of procuring his signature to a settlement and release that he would not knowingly have made. No relative or friend to whom he could turn for enlightenment was present or within his reach. The two men called in to witness his signature were strangers to him. Of course, had he been suspicious or experienced and wary he *could* have refused to sign until he had taken time to investigate and to inform himself as to the character of the instrument he was asked to sign. So in all such cases. It is argued that when a person who cannot read signs a paper without having it read to him he is guilty of such negligence as estops him from complaining thereafter that he was ignorant of its contents. Such statement of the rule is too general and absolute. The law does not read the ignorant and unwary altogether out of the pale of its protecting and remedial influence. If one has been deceived and misled by the fraudulent misrepresentations and conduct of the opposite party and thus induced to sign a paper, believing it to be what it is represented to be when in fact it is something else, he may be entitled to redress. There are cases of course in which relief was denied because under all the circumstances it was clear the complaining party had failed to avail himself of means readily accessible to him of informing himself as to the true character of the instrument. [See Brennecke v. Ganahl Lumber Co., 329 Mo. 341, 44 S. W. (2d) 627.] In our judgment this is not such a case. We think that under the circumstances of this case the court could not properly have declared as a matter of law that plaintiff was bound by the release. This subject received extended and careful consideration in State ex rel. Union Pac. Railroad Co. v. Bland, 324 Mo. 601, 23 S. W. (2d) 1029. The facts there were sufficiently similar to those of the instant case to make the decision in point. The court reviewed a number of decisions on this question. Pertinent to the instant case we quote, 324 Mo. 1. c. 610:

"'The real and ultimate question in such instances is whether the fraudulent acts and statements were of such nature that the other party had a right to rely on them; if they were there was no negligence; if not there was no actionable fraud. Hence it is misleading to say the evidence must show fraud *plus* absence of negligence. Or, putting it another way, some of the authorities say the fraud is actionable when it induces the negligence. [13 C. J., sec. 250, p. 372; Laird v. Keithley (Mo.), 201 S. W. 1138, 1142.] But it is a misnomer to use the word 'negligence' at all in the above connection if it is to be understood as carrying its usual signification—failure to use the degree of care which an ordinarily prudent person would exercise in the same or similar circumstances. [45 C. J., sec. 52, p. 683, sec. 74, p. 699; Jablonowski v. Modern Cap Mfg. Co., 312 Mo. 173, 186, 279 S. W. 89, 92.] For the law of fraud does not exact of the victim that degree of caution which some other hypothetically

prudent person would have used, but only reasonable care in view of *his* situation. All the cases show this. The snares of the fraud-feasor are most often set for the incompetent, the ignorant and the unwary.'' [See, also, Ensler v. Mo. Pac. Ry. Co., 324 Mo. 530, 23 S. W. (2d) 1034; Rau v. Robertson (Mo.), 260 S. W. 751; State ex rel. Brown v. Trimble, 324 Mo. 353, 23 S. W. (2d) 162.]

Appellant contends that the rule applied in the Rau and Ensler cases has been changed or at least modified by the later decisions in Brennecke v. Ganahl Lumber Co., supra, and Yerxa, Andrews & Thurston, Inc., v. Viviano (Mo.), 44 S. W. (2d) 98. We do not so read said later cases. Both are clearly distinguishable in their facts from the Rau and Ensler cases and from the instant case. The Brennecke case cites the Ensler case without disapproval or criticism. In Yerxa, etc., v. Viviano there is a general statement that where a person cannot read a contract it is his duty to procure some one to read or explain it to him before he signs it and that his failure so to do is such gross negligence as will estop him to avoid it on the ground that he was ignorant of its contents. That the court did not mean to hold that the rule as stated is without exception or qualification is shown by the fact that the cases cited in support of the statement, among them State ex rel. v. Bland, supra, all recognize the exception where fraud of the opposite party induces the signing and by the further fact that the court immediately proceeded to point out that there had been no fraud or misrepresentation practiced by the opposite party, which, with other circumstances pointed out in that case clearly distinguish it from the instant case.

Appellant argues earnestly and at length that plaintiff's testimony relative to the release, contradicted and, appellant says, incredible as it is, does not amount to substantial evidence under the rule followed by the Federal courts and that the rule of the Federal courts must govern since the case is one under the Federal Act. We cannot say that plaintiff's testimony is incredible. It is strongly contradicted and is not corroborated by that of any other witness. But it is positive and direct. Its weight and credibility and the question of fact thus presented were clearly questions for the jury under our State practice, and such we understand to be the rule also in the Federal courts where a question of fact on conflicting but positive and direct testimony is presented. In Pennsylvania Railroad Co. v. Chamberlain, 288 U. S. 333, 53 Sup. Ct. 391, 393, it is said: ''It, of course, is true, generally, that where there is a direct conflict of testimony upon a matter of fact, the question must be left to the jury to determine, without regard to the number of witnesses upon either side.'' [See, also, Gunning v. Cooley, 281 U. S. 90, 50 Sup. Ct. 231, 233; Begert v. Payne (C. C. A.), 274 Fed. 784, 787; Mt. Adams & E. P. Inclined Ry. Co. v. Lowery (C. C. A.), 74 Fed. 463, 476-7.]

■ II. In our opinion appellant's contention that there was no evidence in the case to warrant a finding of negligence on its part must be sustained. The action is founded on alleged negligence.

"The Federal courts have long held that where suit is brought against a railroad for injuries to an employee resulting from its negligence, such negligence is an affirmative fact which plaintiff must establish. [Citing cases.] In proceedings brought under the Federal Employers' Liability Act rights and obligations depend upon it and applicable principles of common law as interpreted and applied in Federal courts; and negligence is essential to recovery." [New Orleans & N. E. Railroad Co. v. Harris, 247 U. S. 367, 371.]

The negligence charged and upon which plaintiff submitted his case was defendant's failure to warn him of the presence of the pile of gravel in his pathway. Defendant could not have been negligent in that respect unless it knew or in the exercise of due care could have known of the existence of such obstruction. There is no evidence that it had placed such gravel or caused it to be placed there or had actual knowledge or notice that it was there. For proof of constructive notice such that in the exercise of due care defendant should have known of such obstruction and removed it or warned him thereof, plaintiff relies and must rely on the testimony of Sweet. We find no other evidence tending to show such notice to defendant. Plaintiff's testimony shows only that the gravel pile was there when he stumbled over it but nothing as to how long it had been there. The record is barren of evidence on that point unless it is to be found in Sweet's testimony. For aught that otherwise appears in the record that gravel may have dropped, without defendant's knowledge, from a car of train 78 or a car in some other train too recently before plaintiff fell over it for defendant in the exercise of ordinary care to have discovered it before plaintiff's injury. There is no showing of how the cars in train 78 were loaded or what, if any, other trains had recently before passed over track 5. If the pile of gravel Sweet saw on the morning of December 16 was the same pile of rock or gravel over which plaintiff stumbled on the morning of December 18, the intervening time was sufficient to charge defendant with notice of its existence. If the one Sweet saw was a different one, obviously its existence on December 16 could not tend to impart notice to defendant of the existence on December 18 of the pile over which plaintiff stumbled.

The obstruction over which plaintiff stumbled was on the east side of track 5. Plaintiff located it twelve of fifteen car lengths north of the south end of track 5. He described it as two or three bushels of rocks, some large, some small, sand and stuff. Sweet saw a pile of three or four bushels of "gravel" (no further description) between tracks 4 and 5, a little closer to track 5 than to track 4, twelve or fifteen car lengths from the *north* end of track 5. There is no

other evidence in the record of the identity of the two piles of gravel. Disregarding the difference in the description of size and composition of said two piles as of no serious consequence, there are two important hiatuses in the evidence. There is no evidence showing or tending to show from which side of the yard the tracks therein were numbered or on which side of track 5, whether east or west, track 4 was located, which means there was no evidence whether the pile of gravel Sweet saw "between track 4 and track 5" was east or west of track 5. If on the west side it was not the pile over which plaintiff fell and can cut no figure in the case. Also there was no evidence showing or tending to show the length of the yard north and south or the length of track 5, except that it may be inferred it was long enough to accommodate at least thirty cars, since plaintiff locates the obstruction twelve of fifteen car lengths from the south end and the gravel Sweet saw was about that distance from the north end. But the track may have been and doubtless was much longer. It is common knowledge that freight trains nowadays are often much more than thirty cars in length and track 5 is referred to in the evidence as one on which trains, not merely parts of trains, were made up. The mere fact, if it be a fact, that plaintiff may have underestimated the distance of the obstruction he fell over from the south end of the track is not important except as it bears upon the question of identity of that obstruction with the pile of gravel Sweet saw. But it does bear upon that question. Such identity must appear, either by direct evidence, or by reasonable inference, not mere guess or conjecture, from facts admitted or established by evidence. Under the Federal Rule as under that of our State courts, the plaintiff is entitled on demurrer to the evidence to have the court assume that the evidence in his favor "proves all that it reasonably may be found sufficient to establish, and that from such facts there should be drawn in favor of (plaintiff) all the inferences that fairly are deducible from them." [Gunning v. Cooley, 50 Sup. Ct. l. c. 233.] But a mere scintilla of evidence is not sufficient. See Hardy-Burlingham Mining Co. v. Baker (C. C. A.), 10 Fed. (2d) 277, wherein the scintilla rule is discussed and wherein it is said, 10 Fed. (2d) l. c. 278, quoting from Mt. Adams, etc., Co. v. Lowery, supra:

"A scintilla of evidence, or a mere surmise that there may have been negligence on the part of the defendants, clearly would not justify the judge in leaving the case to the jury. There must be evidence upon which they might reasonably and properly conclude that there was negligence."

And where the record leaves the matter in the realm of speculation and conjecture it is not enough. [C. M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 478.] Plaintiff's evidence is sufficient to establish two facts, viz., that he fell over a pile of gravel on the east side of track 5, twelve or fifteen car lengths from the south end of the track,

and that two days previously Sweet had seen *a* pile of gravel, somewhat similar in size and appearance, let it be said in plaintiff's favor, on either the east or west side of track 5, twelve or fifteen car lengths from the north end of that track, with no showing as to the length of the track. From those facts can it be reasonably inferred or deduced—not merely guessed or conjectured—that the two piles were one and the same? We think not, and for the reasons indicated we are forced to the conclusion that the evidence was insufficient to show notice to defendant of the presence of the obstruction complained of, consequently insufficient to show negligence on defendant's part.

III. It is argued that plaintiff's testimony as to the manner in which he fell, striking his leg against the end of a cross-tie without touching the side of the car in falling, is so opposed to natural law and physical facts as to be incredible and not to amount to substantial evidence. We have considered this argument and examined the evidence. Without further lengthening this opinion by detailing the evidence on this point we deny the contention, being convinced that it is not well founded.

Several criticisms of plaintiff's Instruction No. 1 are also advanced. Plaintiff concedes that the instruction is faulty in certain respects but says the conceded errors therein could not have been prejudicial. In case of another trial the instruction can be rewritten so as to obviate the objections advanced. Since the evidence for want of which plaintiff's case failed can probably be supplied we remand the case instead of reversing outright. The judgment of the circuit court is reversed and the cause remanded. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur, except *Ellison, P. J.,* absent.