Argued January 10; reversed February 26; rehearing
denied March 27, 1946

# WALLER *v.* NORTHERN PACIFIC TERMINAL COMPANY OF OREGON

(166 P. (2d) 488)

Before BELT, Chief Justice, and ROSSMAN, BAILEY, LUSK, BRAND and HAY, Associate Justices.

*Randall B. Kester,* of Portland (Roy F. Shields and Maguire, Shields & Morrison, all of Portland, on the brief), for appellant.

*Frank C. Hanley,* of Portland, for respondent.

BRAND, J.

The complaint alleges that the defendant, an Oregon corporation, owns and operates, as an interstate carrier, a railroad yard in the City of Portland, Oregon, which yard has a number of tracks parallel to each other extending in a general northerly and southerly direction upon which the defendant switches and moves cars; "that the ground area between said tracks is in use by defendant's employees as a footpath in boarding and alighting from moving cars in the performance of their duties and when said ground area is free from depressions, holes, mud, water and debris it affords a reasonably safe footing for defendant's said employes;" that the plaintiff was in the employment of the defendant as an engine foreman on the 14th day of December, 1942; that on the night of the 14th shortly after midnight and during darkness, the defendant was engaged in carrying on switching operations in said yard with the use of a steam locomotive engine; that defendant had upon one of its tracks a number of box cars which were to be switched off of said track and moved; that plaintiff was on the ground area adjacent to the track and alongside of said cars; that upon signal given by the fieldman and by plaintiff said cars were thereupon moved by the locomotive; and that, as said cars were moved, the plaintiff in the performance of his duties attempted to board the same when they were moving at a rate of speed of about seven miles per hour, and after he had taken hold of the handhold on the end of the box car and attempted to step into the stirrup thereof "while running alongside said string of cars on said ground area, through the negligence of the defendant hereinafter stated, he was caused to lose his footing upon said ground area and by reason thereof

was thrown down upon the track between the cars'' and permanently injured.

The specifications of alleged negligence are as follows: (a) That defendant negligently "maintained the aforesaid footpath and ground area along the tracks where plaintiff was working in a slick, slippery and muddy condition and maintained and permitted certain quantities of water to accumulate in depressions in said ground area and * * * negligently caused and permitted certain debris and wooden sticks to be strung along the ground area which plaintiff was required to use'' in boarding the cars. It is alleged that such dangerous and defective condition was known to the defendant, or could have been known in the exercise of reasonable care, but was unknown to the plaintiff, and that the defendant "thereby failed and neglected to provide plaintiff with reasonably safe footing and a reasonably safe place to work, and that *plaintiff when boarding said cars as aforesaid was caused to strike said sticks and debris and slip upon said slick, slippery and muddy ground area and become injured.*'' (Italics ours.) (b) That defendant negligently failed to warn plaintiff of said dangerous condition of said yards. (c) That defendant negligently failed "to keep its said premises where the accident to plaintiff happened in a clean condition, in violation of its rule reading as follows: 'Rule 709. Railroad premises must be kept in neat, clean and orderly condition.' ''

By its answer the defendant admits its ownership of the railroad yards, the maintenance of the tracks, and switching of cars; "admits the ground area between certain of said tracks is in use by defendants' employees as a footpath in boarding and alighting from moving cars in the performance of their duties, and

that such ground in normal condition affords a reasonably safe footing for the defendant's said employees."

It is admitted that the plaintiff was defendant's employee and was on December 14th engaged in switching operations, that it was then dark, and that the plaintiff sustained injuries. The allegations of negligence are denied. The defendant pleads affirmatively that plaintiff attempted to board the cars in a negligent manner while in an intoxicated condition. It is alleged that the plaintiff violated the company rule to the effect that the use of intoxicating liquor is prohibited, and that plaintiff's injuries were the result solely of his own negligence.

As an affirmative defense the defendant stated facts whereby it sought to raise the defense of assumption of risk. To this defense the plaintiff demurred and the demurrer was sustained. Defendant's first assignment of error is based upon the action of the trial court in sustaining said demurrer. In the argument before this court that assignment of error was waived.

The plaintiff's reply denied the affirmative allegations of the answer concerning contributory negligence. The defendant duly moved for nonsuit and for a directed verdict. Judgment for plaintiff was entered, and thereafter the defendant moved for judgment notwithstanding the verdict, or in the alternative for a new trial. Both motions were denied. The defendant earnestly contends that there was no substantial evidence of negligence in any particular alleged in the complaint and that there is no evidence that the injury to plaintiff was proximately caused by the defendant.

The accident occurred in the O. W. R. R. & N. yards, commonly called the "O" yards, which are

maintained and operated for switching purposes by the defendant Northern Pacific Terminal Company in connection with other adjacent and larger yards. The O yard contains tracks 80 to 87. They lie east of and parallel to Front Avenue, west of the Willamette River and south of the Broadway bridge. They lie between the O. W. R. R. & N. freight houses, which abut for 1,000 feet on Front Avenue, and the Mc-Cormick Terminals, which abut for about 1,300 feet upon the river. The tracks in question commence at a line about 1,300 feet south of the bridge and extend northerly about 1,000 feet. At the north end of the O yard, tracks 80 to 87 connect with switching tracks which extend northerly and westerly to a lead track, which passes under the Broadway bridge and diagonally crosses Front Avenue to the west side thereof. North of the bridge and west of Front Avenue, the lead track connects by means of switches with numerous other tracks extending southerly into the middle yard which lies west of Front Avenue in the vicinity of the Broadway bridge under which many tracks pass. The middle yard contains freight tracks numbered 12 to 23, and west of these lie eleven passenger tracks. Other yards of the defendant company extend northerly for about two and a half miles. There is considerably more than a mile of track in the O yard between the freight house and the McCormick Terminals.

On tracks 80 to 87, loaded and empty cars are spotted by the employees of the defendant company. They are switched from track to track on crossovers or are hauled north out of the O yard onto the lead and then returned to another track in the O yard or transported to the middle yard, as the case may be.

Box cars are loaded and unloaded in the O yard, the cars being spotted opposite each other on the tracks.

When the doors of the cars are open, gangplanks are laid from one car to the other and freight is trucked over and across the tracks through the various box cars and over the connecting gangplanks to the proper car for loading. The loading and unloading is done by the employees of various railroads and forwarding companies. No loading or unloading is done by the defendant company, the only function of that company being to conduct switching operations in the various yards, placing the loaded and empty cars in the required positions and making up trains, which are then hauled out of the O yard and turned over to the railroad companies for transportation to their various destinations.

Plaintiff was foreman of a switching crew. His immediate duty was to perform switching operations in the O yard so as to make it possible to make up a merchandise freight train known as the CBX on track 84. Many switching operations were performed in the course of the evening of December 14th. At about midnight the CBX was made up ready to be taken out of the O yard over the lead in a northwesterly direction and then back into the middle yard. Two cars were to be cut off from the rear or southerly end of the CBX. A member of plaintiff's crew pulled the pin releasing the two cars and signaled with his lantern that the train was ready to move. The plaintiff, as foreman, passed the signal on to the engineer who started the engine and commenced to haul the CBX northerly along track 84 toward a junction with the lead track. The plaintiff was on the path between tracks 83 and 84 and on the west side of track 84. As the train commenced to move in a northerly direction, he began to walk in a southerly direction or, as plaintiff said, "against the movement of the train." While

thus moving slowly, he attempted to mount the moving train, the speed of which was variously estimated at from four to eight miles per hour. Plaintiff took hold of the grab iron on the side and at the rear end of the box car with his right hand, turning to get hold of the grab iron. He then started to put his right foot on the stirrup, which is a piece of strap iron that comes down about eighteen inches below the sill of the car. As he attempted to put his right foot in the stirrup, his left foot slipped and he fell under or between the cars with the result that the car behind the one which he had attempted to board ran over his arm causing the injuries in question.

We turn to the evidence concerning the condition of the premises and the circumstances of the accident, viewing the testimony, as we must, in the light most favorable to the plaintiff.

No one saw the accident, but concerning it plaintiff testified as follows:

"Q   When you repeated and gave the signal, did the cars start?

"A   Yes.

"Q   What did you do then?

"A   Well, I kept moving back towards the rear end of the train, with the intention of boarding somewhere near the rear end of it."   *   *   *

"Q   How fast did the cars move out after they got started?

"A   Oh, I don't know, seven or eight miles, maybe, something like that.

"Q   Seven or eight miles, you mean, an hour?

"A   Yes. I couldn't judge the speed of it."

The engineer testified that he "started that train easy." The switch to the north was against him. He "couldn't go very fast.   *   *   *   We get four miles an hour at most."

The plaintiff testified further:

"Q Did you get hold of the grab iron?

"A I did get hold of the grab iron." * * *

"Q What happened when you attempted to get on?

"A Well, I stepped on a stick, it rolled under my foot and I missed my footing, and I didn't make the stirrup, I missed my grab iron hold, it throwed me on the ground." * * *

"Q You say you hit a stick, with what foot, do you know what foot?

"A The left foot slipped.

"Q The stick rolled with you?

"A Yes." * * *

"Q You say there was a stick there that you stepped on?

"A Yes, sir.

"Q You never saw the stick, did you?

"A No, sir.

"Q You don't know how big a stick it was?

"A I couldn't say.

"Q You don't know it was a stick, do you?

"A Yes, I know it was a stick because it wouldn't have rolled under my foot that way.

"Q Wouldn't a piece of gravel, a piece of rock, roll under your foot?

"A Yes, but I will say it was a stick." * * *

"Q All you can say, it felt like a stick?

"A Yes." * * *

"Q All that you know about it, in fact, Mr. Waller, is this, that you put your foot on something that rolled and caused your foot to come out from under you, isn't that the fact?

"A Well, I would say it was a stick.

"Q If you didn't see it, how do you know it was a stick?

"A Well, a stone wouldn't fly up and hit you on the other shin over there."

Later plaintiff testified that he had a bruise on his right shin but that he did not know whether it came from a stick or a stone or whether it came when he fell on the ground. He admitted that there was no way to tell how the bruise came.

"Q  Now you can tell through your shoe, without having had a chance to look at a thing, whether it is a stick or a piece of flat stone or a piece of large gravel, can you?

"A  No, but I would say to the best of my knowledge it was a stick.

"Q  Whatever it was that you say you slipped on, you don't know who put it there, or how long it had been there, or where it came from, do you?

"A  No, sir."   *   *   *

"Q  Mr. Waller, you said you would call it a stick you slipped on. On what conclusion do you base that?

"A  Well, I had seen sticks down in there—

"Q  Pardon?

"A  I say, I had seen sticks and blocks down in there the day before, and some that night."

The location of the "sticks and blocks" which he had seen "down in there" is left to speculation. Except for his statement, supra, that he stepped on what he believed to be a stick, plaintiff gave no testimony concerning any debris at the point of the accident on the night in question.

Plaintiff gave the following testimony concerning general conditions in the yard, or yards, prior to the day of the accident. It will be observed that the time when and the place where the debris was seen is unspecified, except that a portion of his testimony is limited to a strip a thousand or more feet in length between tracks 83 and 84.

Concerning general conditions between tracks 83 and 84, the plaintiff Waller testified:

"Q Well, was there any accumulaton of water around?

"A Well, I don't recall right that night.

"Q Was there at any time prior to that time?

"A Yes, I have seen water standing down there." * * *

"Q Did you see any mud?

"A Yes, there has been mud there." * * *

"Q Was that where you were attempting to get on?

"A Well, in that vicinity, yes."

In answer to the question whether he had *ever* seen any sticks or debris between tracks 83 and 84, the plaintiff replied in the affirmative and specified: "Various sizes, from half an inch to two inches." He testified:

"Q Were there any times you worked down there between this period from December 2nd up to the accident and other times you worked there, were there any times you saw the tracks free from sticks and debris?

"A At times they would be more clean than others.

"Q Did you ever see anyone working down there?

"A Well, I have seen freight house crews go out and pick up some of their boards, and I have seen section men down there.

"Q Cleaning up between the tracks?

"A I would say they were cleaning up, yes."

Upon cross examination the plaintiff, however, testified that he had not walked the full length of the tracks between 83 and 84 on the night in question and that he had probably been down not more than two or three car lengths.

As to the general situation, the plaintiff testified:

"Q And it is quite the usual thing when cars are being unloaded for the persons who are unloading them, either through accident or carelessness dropping pieces of dunnage or a piece of broken box or what-not, onto the track; that is quite the usual thing, isn't it?

"A Yes.

"Q And you say the maintenance crew comes along there and cleans that stuff up, or people from the freight house clean it up, and then the next time there is a movement or unloading, the same thing is likely to occur again, isn't it?

"A That is right.

"Q Cars are being constantly loaded and unloaded, aren't they?

"A Yes, sir.

"Q It would be impossible to say what time of day or night a piece of wood or dunnage might be thrown off a car or dropped off of a car in unloading?

"A Yes, sir."

Jesse A. Mayfield, a witness for plaintiff, testified:

"A Well, I would go to work down there and there would be stakes out of cars throwed out and all kinds of rubbish, and again it was cleaned up.

"Q That would be between tracks 82 and 83?

"A Yes, and other tracks, too; they would throw boards and stuff out." * * *

"Q Did you walk down between those tracks when you went to the rear end of this train?

"A Yes, sir.

"Q What if anything, did you observe as to the condition of the ground between the two tracks on this night? [Referring to tracks 83 and 84.]

"A Well, nothing only some debris in there. I didn't notice anything only debris like there is always around, you know, a railroad.

"Q Were there any sticks there?

"A Yes, there was stuff in there I don't recall.

"Q Any mud?

"A Yes, there was some mud around the switches.

"Q How about water, any accumulation of water between the two tracks?

"A I don't say there was any water. There may have been some, but I don't recall noticing it." * * *

"Q What were the size of the sticks and debris, if you know, that you observed between tracks 83 and 84 on the night of December 14, 1942, when you walked along the track?" * * *

"Q You may describe the size of some of the sticks you saw.

"A All different sizes. I didn't measure any of them, but small debris.

"Q Sticks?

"A Yes." * * *

"A Well, different sizes; I didn't measure any of them, I couldn't tell you how thick any of them was.

"Q Can you give us an estimate of the size of them?

"A Well, small stuff.

"Q Would they be an inch thick?

"A Probably, and shingles, thinner boards, maybe.

"Q Would they be half an inch thick?

"A They probably would.

"Q Would there be any two inches thick, or an inch and three-quarters?

"A There may be. I didn't see any that night that I recall.

"Q You don't recall seeing any?

"A No, I don't recall seeing any that thick, but there could have been. I walked down there, it was dark.

"Q Did you have a lantern?

"A Yes, a lantern, but they give a very small light, you know.

"Q And did you observe that same condition prior to the night of this accident?

"MR. MAGUIRE: Objected to—

"A (interrupting) At times I have, yes.

"MR. MAGUIRE: Just a moment.

"THE COURT: The objection will be overruled.

"MR. MAGUIRE: Exception, please.

"Q Did you observe it prior to the accident?

"A At times, yes.

"Q And how long prior to the time of the accident?

"A Oh, you are liable to go down there any night and find it, and the next night it would be cleaned up. They have men down there cleaning up the yards at times.

"Q Did you ever see men working, cleaning the yards?

"A Oh, yes.

"Q Who would they be?

"A They would be the section men or maintenance men keeping the yards clean." * * *

"A Well, we are liable to go down there and find them any time, and the next time we go down—

"Q (interrupting) Now—

"MR. MAGUIRE: (interrupting) Let the witness answer.

"A And the next time you would go down it would be cleaned up, and the next time you go down there would be rubbish there again, you see.

"Q Now I will get back to my question again. How long prior to the date of the accident did you make these observations and see the sticks and debris between tracks 83 and 84?

"A All the time I worked there.

"Q How long?

"A All the time I worked there down in the yard.

"Q And you worked there how long?

"A A month; two or three weeks.

"Q Prior to the accident?

"A Yes." * * *

"Q As a matter of fact, when you walked along the track the different times you did between 83 and 84, you didn't notice anything between the tracks that would cause any difficulty getting on and off the cars, did you?

"A Nothing only maybe a little debris around there or something, I don't know what you call it.

"Q You refer to little bits of wood?

"A Yes, at times there was stuff, and other times there wouldn't be. You might go right down there now and there wouldn't be nothing there, and you go down in twenty minutes and there might be a railroad tie they had taken out, they were going to put in a new one." * * *

"Q Now, the night in question, December 14, you didn't notice anything along the tracks that would cause any difficulty getting on and off cars, did you?

"A No, I didn't notice anything like that where Mr. Waller was hurt * * *." * * *

"Q And you didn't notice anything along the tracks that would cause particular hazard or trouble getting on or off the cars?

"A No, I wouldn't say I noticed anything.

"Q And this debris you mentioned, there was nothing that would cause a man any difficulty getting on and off cars?

"MR. HANLEY: Now, I object to that—

"A (interrupting) Oh, yes, if you would step on it and it would roll under your foot, it would."

* * *

"Q On the day after the accident didn't you tell Mr. Woods, investigating this accident for the Railroad company that, 'I was along the track No. 84 where we had worked and I saw that there was some slipping conditions around the 83 and 84 switch, but further down the track I saw no particular slipping or tripping hazard there, no loose material laying between the tracks that one could slip on or trip over in any way'?''

(The switch where witness saw slipping conditions was about two hundred feet from the place of plaintiff's fall.)

"A I did not see any, myself.

"Q You didn't see any?

"A Yes; maybe a little debris like I told you. You know you will see that in all yards, as far as that goes, there will be stuff there." * * *

"A I didn't see anything anyone would slip on, no. Of course, I hadn't worked right in that vicinity. I had worked down at the end of the track. I hadn't worked in the vicinity." * * *

"Q As you walked back and forth on the ground between tracks 83 and 84 that evening on various occasions, you didn't see anything that would cause anyone to slip or trip or stumble, is that correct?

"A No, I didn't see anything that would cause you to fall down." * * *

"Q You just said a few minutes ago—and I want to make sure you are standing by it—you didn't see any debris between 83 and 84 that would cause a man any difficulty?

"A No, I didn't see any."

There was some mud and grease seen on plaintiff's clothes after the accident. John A. Humble, the assistant manager of the defendant company, testified that he made an examination of tracks 83 and 84 within an hour or an hour and a half after the accident.

"Q Now what was the condition of the space between tracks 83 and 84 with regard to having any debris there or sticks or anything which might cause an obstruction?

"A I did not see anything.

"Q Did you look carefully?

"A Yes, sir." * * *

"Q Now, were there any pools of water along there?

"A No, sir, but the ground was damp.

"Q By the way, do you recollect whether or not it had been raining that day?

"A It had sometime during the day or evening, but I cannot state when."

Witness testified that he did not see any debris or sticks that night. Concerning the general procedure in the yard, witness Humble testified without contradiction:

"Q Now, you have section crews and maintenance crews working down around all through the Northern Pacific Terminal yards?

"A That is correct.

"Q It is their duty to keep those yards clean, free from debris, sticks and stones?

"A That is right.

"Q And they do that?

"A Yes." * * *

"Q And there is from time to time a certain amount of that debris around the yard; that is right, isn't it, you have seen it there?

"A Yes, I have, occasionally.

"Q And you have seen it there more or less constantly when there is unloading going on?

"A It is cleaned up every day, but at times, of course, cars moving around, a piece could fall off." * * *

"Q So that anything that happens to be around there after your section crew is gone— they quit when, about four-thirty?

"A About that.

"Q Anything after that, your section crew is gone, it is not cleaned up until the next day or whenever they get to it, isn't that right?

"A That is right." * * *

A car is kept by the defendant company in the vicinity in which fallen dunnage is placed by the crew. There are no regular night section crews employed to clean up the yards; those crews work days only. The section crews walk the tracks every day. Humble testified:

"A Yes, Mr. Hanley, we have emergency men, one or two on nights.

"Q If there is a condition arises out of the ordinary, then you call an emergency man or two to help out?

"A Yes, sir."

Carl G. Cook was called as a witness for the defendant. He was a merchandise clerk in the employ of the Union Pacific Railroad Company. He inspected the path between tracks 83 and 84 at about 8:00 a. m. the morning after the accident. He testified:

"Q Now, what was the condition of the path between tracks 83 and 84 as you saw it that next morning?" * * *

"A The ground was damp. It wasn't slippery where I saw it, where I was told the accident happened. I went out there merely through curiosity, any more than a person would hear a fire department and go down to see what was the matter. I had no reasons for going out there at all outside of just through curiosity, and I walked down along the track and the ground was damp, but it was not wet, and it is cindery.

"Q I beg pardon?

"A It is more or less cinders and it is tamped down hard.

"Q Were there any sticks or lumber or debris there that would cause an obstruction or interfere with a man walking?

"A I didn't see any, no, sir."

Thomas R. Walker, an employee of the defendant, was a repairman employed in the maintenance of tracks, switches and the like. He was foreman of a patrol on a night crew. On the evening of December 14th he inspected the switch on the crossover from track 82 to 83 in the O yard. He testified as follows:

"Q Did you have occasion to notice the ground between tracks 83 and 84 that evening?

"A 83 and 84,—I walked across 84 to 85, to elevate a platform over there. That is why I noticed that there were just two cars on those tracks.

"Q Did you observe the condition of the ground between tracks 83 and 84 at that time?

"A Well, as far as I traveled, the ground was dry, I wouldn't say it was match dry, but the weather that day was—

"Q (interrupting) Was it muddy?

"A No, it wasn't muddy.

"Q Did you observe whether or not there was any debris of any kind along between those tracks?

"A No, there wasn't, as far as I could see."

Tony Bozich, a witness for the defendant, testified that at the time of the accident he was a track walker in the Maintenance of Way Department. He testified:

"Q What does a track walker do?

"A Track walker looks around to see if he can find anything dangerous on the track, broken rail or broken switch, or find anything along the tracks that might be dangerous, and report to the foreman.

"Q Do you walk back and forth along the tracks in the yard?

"A You walk one track up, you look this side and the other side, you go between the other tracks and look at the rails on one side and the other side.

"Q At this time around December 14 and 15 were you examining those tracks every day?

"A I examined them the day before and the day afterwards.

"Q You mean December 14 and 15?

"A December 14, 15 and 16.

"Q On December 15th did you walk between tracks 83 and 84?

"A I did.

"Q You did so for the purpose of inspecting as you describe?

"A Inspecting just like any time before.

"Q Did you find anything there?

"A No, I didn't."

On December 15th the witness made an inspection between tracks 83 and 84 seeking to find the location of the accident. He found the plaintiff's glasses about 200 feet south from the switch where track 84 joins the lead. He testified:

"A I didn't find any marks on the rail but I found little, small splinters near the rail, maybe a foot or a foot and a half away from the rail, it may be half or three-quarters of an inch stuff, it may be eight or ten inches long."

He testified that the cars overhang the rails about 24 inches on each side of the track, a box car being about 4 feet wider than the track itself. He testified:

"Q Now in the area of the two overhangs between 83 and 84, what was the condition of the ground as far as footing was concerned?

"A The condition was pretty good, I can't see nothing that would be dangerous, only as I say little small splinters around.

"Q And those splinters that you spoke of, are they where they were walking between the tracks, or were they within the overhang under the edge of the car?

"A It was right near the rail.

"Q Right near the rails?

"A Right near the rails.

"Q Would that be within the two-foot area on the side of the rail?

"A That is right."

Speaking of the splinters, witness testified on cross examination:

"A Some of them were small pieces, some eight or ten inches, some maybe less than that, but not thicker than a half or three-quarters of an inch.

"Q You mean thick?

"A That is right.

"Q And a good many of them down there?

"A Say probably three or four pieces, just that one little bunch.

"Q I understood you to say they were against the rail?

"A They were against the rail. I thought it is where the body was dragged, dragging, bringing them splinters in one little bunch. If it wasn't, those splinters would probably be one every two or three feet, I don't know." * * *

"Q Now did you observe any—speaking of the day before the accident, did you observe anything in that four-foot pathway between 83 and 84 at about the place where you found his glasses?

"A No, I don't find anything dangerous.

"Q And then on the day after when you found the glasses, did you find anything, any kind of an obstruction—

"A (interrupting) No, I don't, any more than there was before.

"Q Let me finish the question. I am referring to the point at which you found the glasses. Now your answer?

"A I don't find anything dangerous where I found the glasses and where the glasses was, near the track 83 about four foot—."

Witness Winchell also testified without contradiction that there are two track walkers in his department who inspect the tracks in the O yard every day in the week.

■■ Omitting repetitious matter, the foregoing constitutes a full and fair statement of all of the evidence favorable to the plaintiff and relative to the condition of the premises. As we have said, in determining whether there was substantial evidence of negligence proximately causing plaintiff's injury, it is our duty to consider the testimony in the light most favorable to the plaintiff; but it is also our duty to give consideration to evidence adverse to the plaintiff's contention where it is wholly undisputed and uncontradicted and relates to matters of fact as distinguished from mere inferences. Where a plaintiff's case is based upon an inference or inference only, that case must fail upon proof of undisputed facts inconsistent with such inferences. *Pennsylvania Railroad Co. v. Chamberlain*, 288 U. S. 333, 77 L. Ed. 819, 53 S. Ct. 391.

Giving the plaintiff full benefit of all evidence favorable to him, the following conclusions of fact appear necessary: The allegation of the complaint concerning the slippery and muddy condition and the accumulation of water may be disregarded. The only mud was at the switch which was about 200 feet from the scene of the accident, and the only claim of the

plaintiff as to the cause of his slipping is based upon his inference that he stepped upon a stick which he did not see. The only specifications of negligence in the complaint which require consideration are the allegations that the defendant negligently caused and permitted certain debris and wooden sticks to be strung along and upon the ground area which plaintiff was required to use in boarding the cars, and that such dangerous and defective condition was known to the defendant or could have been known by the exercise of reasonable care. It is alleged that the existence of sticks and debris was unknown to the plaintiff, but the plaintiff's own testimony shows that he had full knowledge that sticks and debris occasionally fell within the yards.

Defendant's failure, if any there was, to warn the plaintiff concerning conditions in the yard is not shown to have any proximate relation to the accident. The character and size of the object on which plaintiff testified he slipped is left to speculation. No one claims to have seen it prior to the accident. No one identified it after the accident as the object on which plaintiff slipped, though there is evidence of "splinters" being seen the next day under the overhang and near the rail at the approximate point of the accident. Assuming that the plaintiff slipped by stepping on a stick, there is not a scintilla of evidence to indicate how long the stick had been there. From all that appears from the evidence, it may have fallen from the train which the plaintiff was boarding.

Turning from the evidence concerning the actual point of the accident and considering the evidence concerning the general conditions in the yard, we find evidence that sticks and debris did fall into the yard

from time to time. The uncontradicted evidence is that the debris resulted from loading and unloading operations in the yards as freight was carried by trucks through the box cars and over the gangplanks. The uncontradicted evidence is that these operations were carried on by employees of the various railroad companies and forwarding companies. There is not a scintilla of evidence that the defendant terminal company ever placed or caused to fall into the yard any sticks or debris. It neither loaded nor unloaded cars. Its sole function was to conduct switching operations upon cars to be loaded or unloaded by others. The uncontradicted evidence is that the yards were cleaned every day, including the day before, the day of, and the day after the accident. There is no testimony that any sticks or debris ever remained in the yards for any time longer than the period from the end of one day's inspection to the end of the next day's inspection. In other words, there is no evidence that the yards were not completely cleaned at least once each day. The duty of the defendant concerning the mile or more of trackage in the O yard was no different from its duty as to the many miles of tracks in the other yards of the defendant. The very size and character of the area differentiate this case from those which relate to inspection of depots and stores having limited area and accommodating dense pedestrian traffic. The complaint contains no allegation of any failure or insufficiency of inspection.

■ Under the Federal Employers' Liability Act, a defendant employer can be held liable only for negligence proximately causing the injury. Liability cannot be predicated on mere speculation. *Tennant v. Peoria & Pekin Union R. Co.*, 321 U. S. 29, 88 L. Ed.

520, 64 S. Ct. 409; *Brady v. Southern Ry. Co.*, 320 U. S. 476, 88 L. Ed. 239, 64 S. Ct. 232; *Northwestern Pacific Railroad Co. v. Bobo,* 290 U. S. 499, 78 L. Ed. 462, 54 S. Ct. 263; *Chesapeake & Ohio Ry. Co. v. Stapleton,* 279 U. S. 587, 73 L. Ed. 861, 49 S. Ct. 442; *McPherson v. Oregon Trunk Ry.,* 165 Or. 1, 102 P. (2d) 726; and *Campbell v. Southern Pacific Company,* 120 Or. 122, 250 P. 622.

■ The rights which the Act creates are federal rights protected by federal rather than by local rules of law. The rights and obligations of plaintiff and defendant depend upon the statute and upon applicable principles of common law as interpreted by the federal courts. *Bailey v. Central Vermont Ry., Inc.,* 319 U. S. 350, 87 L. Ed. 1444, 63 S. Ct. 1062; *Chesapeake & Ohio Ry. Co. v. Stapleton,* supra; *Southern Ry. Co. v. Gray,* 241 U. S. 333, 60 L. Ed. 1030, 36 S. Ct. 558.

■ So far as concerns the duty of an employer to furnish a safe place in which to work, the federal interpretation of the employer's duty under the F. E. L. A. is derived from and is consistent with the general common law. *McGivern v. Northern Pac. Ry. Co.,* 132 F. (2d) 213 (C. C. A. 8th)

> "In this situation the employer's liability is to be determined under the general rule which defines negligence as the lack of due care under the circumstances; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done." *Tiller v. Atlantic Coast Line R. Co.,* 318 U. S. 54, 67, 87 L. Ed. 610, 63 S. Ct. 444, 143 A. L. R. 967.

*Patton v. Texas and Pacific Railway Co.,* 179 U. S. 658, 45 L. Ed. 361, 21 S. Ct. 275.

■ The defendant is not the insurer of the safety of its employees and is not under any obligation to keep the premises absolutely safe. *Patton v. Texas and Pacific Railway Co.*; *McPherson v. Oregon Trunk Ry.*; supra.

■■ Failure to guard against a bare possibility of accident is not actionable negligence. *Brady v. Southern Ry. Co.*, supra. The plaintiff must present more than a mere scintilla of evidence of negligence. Substantial evidence is required. *McGivern v. Northern Pac. Ry. Co.*, supra; *Poe v. Illinois Central Railroad Co.*, 335 Mo. 507, 73 S. W. (2d) 779.

"It cannot be said that the situation did not present dangers but danger in a particular phase of an employment does not necessarily imply negligence. * * * Temporary conditions created by employees using or failing to use appliances furnished by the employer are not defects for which the employer may be held responsible in damages." *McGivern v. Northern Pac. Ry. Co.*, supra.

■ In the case at bar the condition of which plaintiff complains was at most a temporary condition and one not created by the employees, but by others who were lawfully in the yard. If the plaintiff fails to present substantial evidence that the injury was proximately caused by the defendant's negligence, the trial court is authorized to grant a directed verdict.

"When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial the result is saved from the mischance of speculation over legally un-

founded claims." *Brady v. Southern Ry Co.,* supra.

█ In actions brought in state courts upon causes arising under the F. E. L. A., the state appellate court is authorized to determine from the evidence whether a verdict for plaintiff is supported by substantial evidence, and, if not so supported, may reverse and direct judgment for the defendant, subject, however, to review of its conclusions by the United States Supreme Court. *Brady v. Southern Ry. Co.,* supra; *Northv--- tern Pacific Railroad Co. v. Bobo,* supra; *Baltimore & Ohio Railroad Co. v. Berry,* 286 U. S. 272, 76 L. Ed. 1098, 52 S. Ct. 510; *Atchison, Topeka & Santa Fe Railroad Co. v. Saxon,* 284 U. S. 458, 76 L. Ed. 397, 52 S. Ct. 229; *McPherson v. Oregon Trunk Ry. Co.,* supra; *Atlantic Coast Line R. Co. v. Driggers,* 279 U. S. 787, 73 L. Ed. 957, 49 S. Ct. 490; and see *Driggers v. Atlantic Coast Line R. Co.,* 151 S. C. 164, 148 S. E. 889 at 913, where the state court pursuant to mandate of the United States Supreme Court entered judgment for the defendant.

█ The fact that an accident occurred constituted no evidence of negligence on the part of the defendant in view of the use of the yard by others for whom the defendant was not responsible. The doctrine of res ipsa loquitur does not apply and the mere fact that the accident occurred raises no inference or presumption that the defendant was negligent or that its action or inaction was the cause of the accident. *Patton v. Texas and Pacific Railway Co.,* supra.

█ Under the circumstances of this case, the general rule concerning the duty owed by the owner of land to persons employed or invited thereon applies. The duty of the defendant under the F. E. L. A. is the same

as the duty of a proprietor to invited guests so far as the rule now to be considered is concerned.

■ The rule is firmly established that where plaintiff slips upon an object upon the premises of the defendant, plaintiff must, in order to establish liability, show that the defendant or his agent put the dangerous object there, or that they knew or by the exercise of reasonable diligence could have known that it was there and failed to exercise diligence to remove it. *Starberg v. Olbekson,* 169 Or. 369, 129 P. (2d) 62, (vegetable on floor in aisle of store); *Lee v. Meier & Frank Co.,* 166 Or. 600, 114 P. (2d) 136, (pillow in aisle of department store); *Gardner v. Regal Fruit Company,* 147 Or. 55, 31 P. (2d) 650, (fruit or vegetable on sidewalk in front of defendant's fruit stand); *Morrison v. Pacific Northwest Public Service Co.,* 146 Or. 225, 30 P. (2d) 344, (fresh plum on floor of vestibule of street car); *DeMars v. Heathman,* 132 Or. 609, 286 P. 144, (grease spot on stair); *Goddard v. Boston & M. R. Co.,* 179 Mass. 52, 60 N. E. 486.

■ Since there is no evidence that the defendant caused any dangerous condition in any part of the O yard, it can be held liable, if at all, only upon the theory that it negligently failed to remove an object, or objects, deposited there by others. Assuming that the plaintiff stepped on a stick, there is no evidence that the defendant knew of its existence, nor is the defendant chargeable with constructive notice that any stick was on the ground at the point where plaintiff slipped for there is no evidence as to how long the stick, if any, had been there.

As applied to the place where plaintiff fell, the foregoing authorities are directly in point. The only distinction which could be urged lies in the fact that there

is some evidence in the case at bar that sticks and debris were frequently dropped in the yard by third parties prior to the time of the accident. It may be conceded that if the evidence had disclosed that debris was strewn generally about the area where the accident occurred and if the defendant had negligently allowed it to remain there with notice of its existence, then the defendant's knowledge of the general condition prevailing would have been sufficient to support a verdict for the plaintiff even though the defendant did not know of the particular stick on which the plaintiff slipped. But that was not the case here.

Plaintiff's own evidence established that debris which was dropped in the yard did not continue therein. The undisputed facts are that the yard was inspected daily and cleaned daily. There is, therefore, no room for a mere inference that the debris from previous days remained at the time of the accident or that the area was so strewn with debris as to create a general condition of danger, notice of which might be equivalent to notice of the particular object on which plaintiff may have slipped.

In the present state of the record we have grave doubts of the relevancy of the evidence which was received over defendant's objection and which concerned conditions in the yards days, and even weeks, prior to the accident. There is no contention that defendant did not maintain an adequate system of inspection and no evidence that further and additional inspection would have discovered any stick at the point where plaintiff slipped. The only ''splinters'' discovered after the accident were lying near the rail and would have been under the overhang of any freight car on the track at that point.

■ Under these circumstances we think it was incumbent upon the plaintiff to show that the specific condition alleged to have caused the plaintiff's fall had existed for a sufficient period of time to charge the defendant with constructive notice thereof, or else to show that the general system of inspection throughout the yards and under all of the circumstances was insufficient and that additional inspection, if reasonably required, would probably have discovered the object. This the plaintiff failed to do.

■ We conclude that there was no substantial evidence of negligence on the part of the defendant. This, however, does not imply that we consider the accident unavoidable. There was ample and persuasive evidence from which the jury could have found that the plaintiff on the night in question violated the rule of the company which provides that the use of intoxicating liquor is prohibited. They could reasonably have found that the plaintiff's injury resulted solely from his own conduct while under the influence of intoxicants.

A detailed review of the numerous cases cited by plaintiff is unnecessary. We have carefully examined and find them not inconsistent with our conclusion here. Most of the cases cited involved dangerous conditions created by the employer himself. In others there was evidence that he had knowledge, actual or constructive, of the specific object which caused the injury. In many of the cases cited, the defect was shown to have existed for a considerable period of time prior to the injury. But the defect was by nature permanent in character so that the inference of continuity to the time of the accident would be justified.

*Baltimore & O. R. Co. v. Fletchner*, 300 F. 318, cited by the plaintiff in the instant case, is clearly distin-

guishable. The plaintiff tripped over a rusty barrel hoop which lay between the tracks, and the defendant was held liable for the resulting injury. But upon the issue of notice, it was held that the rusty condition of the hoop justified submission to the jury on the question of constructive notice. There was also evidence tending to indicate that the defendant, and not any third person, had placed the hoop between the tracks. The court observed that the public was excluded from the yard and that the hoop was such as is found on kegs of railroad spikes.

In conclusion we quote from a dissenting opinion of Mr. Justice Roberts:

> "Finally, I cannot concur in the intimation, * * * that, as Congress has seen fit not to enact a workmen's compensation law, this court will strain the law of negligence to accord compensation where the employer is without fault. I yield to none in my belief in the wisdom and equity of workmen's compensation laws, but I do not conceive it to be within our judicial function to write the policy which underlies compensation laws into acts of Congress when Congress has not chosen that policy but, instead, has adopted the common law doctrine of negligence." Roberts, J., in *Bailey v. Central Vermont Railway,* supra.

The judgment is reversed. The cause is remanded to the circuit court with directions to enter judgment for the defendant.