Dewey Lee EDGE and Terry Lee Bobich, Appellants (Defendants),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 5631.

Supreme Court of Wyoming.

June 17, 1982.

Sylvia Lee Hackl, Appellate Counsel, Wyoming Public Defender Program, Cheyenne, for appellants.

Steven F. Freudenthal, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Criminal Division, Allen C. Johnson, Senior Asst. Atty. Gen., and Terry J. Harris, Legal Intern, for appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

ROONEY, Justice.

Appellants-defendants, Dewey Lee Edge and Terry Lee Bobich, were tried together before a jury and found guilty of aggravated assault in violation of § 6-4-506, W.S. 1977,[1] and kidnapping in violation of § 6-4-201, W.S.1977.[2] Appellants word the issue

---

1. Section 6-4-506(b), W.S.1977, provides:

"(b) *With dangerous weapon.* —Whoever, while armed with a dangerous or deadly weapon, including an unloaded firearm, maliciously perpetrates an assault or an assault and battery upon any human being, shall be fined not more than one thousand dollars ($1,000.00), or be imprisoned in the penitentiary not more than fourteen (14) years, or both."

2. Section 6-4-201, W.S.1977, provides:

"Whoever shall willfully, maliciously, fraudulently, forcibly or unlawfully seize, confine, inveigle, decoy, kidnap, abduct, entice away or carry away by any means whatsoever and hold or detain any person, for ransom, reward, or robbery; or whoever shall transport or aid or abet in transporting any person, knowing such person to have been willfully, maliciously, fraudulently, forcibly or unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, enticed away or carried

on appeal from the judgment and sentence as follows:

"Whether the trial court erred in denying Appellants' motion for judgment of acquittal since the evidence adduced at trial was insufficient to sustain a conviction of either charge pending against Appellants."

We affirm.

We recently set out the standard used by this court in reviewing the denial of a motion for judgment of acquittal.

"In reviewing the denial of a motion for judgment of acquittal, we examine and accept as true the evidence of the prosecution together with all logical and reasonable inferences to be drawn therefrom, [citations] leaving out entirely the evidence of the defendant in conflict therewith [citations].

"A motion for judgment of acquittal is to be granted only when the evidence is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime. Or, stated another way, if there is substantial evidence to sustain a conviction of the crime, the motion should not be granted. [Citations.] This standard applies whether the supporting evidence is direct or circumstantial. [Citations.]" *Leppek v. State*, Wyo., 636 P.2d 1117, 1119 (1981).

Viewed by this standard, the evidence is as follows:

On the afternoon of August 7, 1981, a Wyoming Highway Patrolman was given the description of an automobile which had been used in a recent armed robbery. A short time later, he observed an automobile matching this description traveling east on Interstate 90, and followed it. A radio inquiry concerning the license number result-ed in advice that the automobile was stolen. Appellants were in it.

When the patrolmen attempted to stop the automobile, a high speed chase ensued. After running through a roadblock, a tire on appellants' automobile went flat. They, then, abandoned the automobile and ran to a nearby trailer park where they entered a trailer belonging to Herman Carrier. Edge was carrying a butcher knife. Mr. Carrier, who was 74 years old and had difficulty walking, was in the trailer watching television when appellants entered. One of the appellants picked up another knife from Mr. Carrier's kitchen table. Appellants then took Mr. Carrier to the back bedroom of his trailer where they held him for two and one-half hours.

Appellants barricaded themselves in this back bedroom, placing mattresses over the windows. They negotiated with the police through a window of this back bedroom, demanding prescription drugs (Quaaludes), the presence of the President of the United States, the Governor, the Buffalo Police Chief, Johnson County Sheriff and reporters. They threatened several times to kill Carrier unless their demands were met. At the insistence of the police, they permitted Carrier to talk to the police on one occasion. He then said he had not been harmed but requested the police to do as appellants asked or they would kill him. Finally, appellants demanded television coverage of their surrender. The police agreed to videotape the surrender.[3] They then surrendered, and Mr. Carrier was released unharmed.

## AGGRAVATED ASSAULT

We recently set out the elements of assault with a deadly weapon in *Brightwell v. State*, Wyo., 631 P.2d 1048, 1050 (1981).

away by any means whatsoever to be held or detained for ransom, reward, or for robbery, shall, upon conviction, be punished by death if the verdict of the jury so recommend, provided that the sentence of death shall not in any case be imposed by the court if, prior to the commencement of the trial of the case in which the defendant is charged, the kidnapped person has been liberated unharmed.

If the death penalty shall not apply or be imposed the convicted person shall be punished by imprisonment in the state penitentiary for a period of not more than twenty (20) years."

3. The police used a videotape recorder but its batteries were dead.

"* * * [T]he elements of the crime of assault with a deadly weapon in Wyoming are now the unlawful attempt with unlawful intent (maliciously) to commit a violent injury (attempted battery) upon the person of another, with the use of a deadly weapon in that attempt and the apparent ability to accomplish that injury."

Appellants contend that the evidence presented in this case is insufficient on three of these elements: "the attempted battery, the apparent ability to injure, and—as to Appellant Bobich—the use of a deadly weapon."

In *Brightwell, supra,* we discussed the actions of Miss Brightwell which constituted an attempted battery and contrasted those actions with the actions of Miss Harper, a co-defendant who was acquitted of aggravated assault.[4] The victim, Miss Brightwell and Miss Harper were in the cab of the victim's pickup at the time of the incident. The victim was driving, Miss Brightwell was sitting next to the victim and Miss Harper was sitting next to the door on the passenger side. We said there at page 1050:

"As further support for this conclusion, it is easy to see why Ms. Brightwell committed an assault with a deadly weapon and why Ms. Harper did not. Ms. Harper may have been holding a knife at the time of the incident, but she never pointed it in Mr. Emerson's direction nor threatened him with it. In juxtaposition to this is Brightwell's conduct. She not only had her arm around Emerson's neck and pointed a knife at him, but also threatened him by stating 'I mean business.' Clearly she attempted a battery upon him."

■ Accepting as true the evidence of the prosecution together with all logical and reasonable references to be drawn therefrom and viewing that evidence in light of our discussion of attempted battery in *Brightwell, supra,* we find that the evidence of attempted battery in this case is sufficient.

Carrier testified that he saw a butcher knife in the hands of one of the appellants when they entered his trailer and that they took another butcher knife off the table in the trailer. He said that they "taked me to move in the back room." They kept him in the back room with them during the negotiations. Carrier asked the police to do as appellants asked or they would kill him. Appellants told the police several times that they would kill him if the demands were not met.

As in *Brightwell,* the knives in the hands of appellants were deadly weapons. Appellants had the "apparent ability" to commit violent injury on Mr. Carrier, a 74-year-old man who had trouble walking and who they "taked * * * to move in the back room" with them and held there. As in *Brightwell,* the intent to commit violent injury upon Mr. Carrier can be "inferred from the conduct of * * * [appellants] and from circumstantial evidence." Appellants threatened to kill him. They "taked" him with them into the small room which they barricaded against police action. Again, as in *Brightwell,* the attempted battery requirement was present. There was no attempt to use the knife (as in *Brightwell*). Appellant was not physically injured (as in *Brightwell*). Mr. Carrier was in a small room with appellants, unable to walk very well, at age 74, and able to avoid injury only if the police acceded to the conditions imposed by appellants. In *Brightwell,* we said:

"* * * She [Brightwell] indicated that he could avoid injury from use of the knife only *on condition* that he comply with her directions. * * *" (Emphasis in original.) 631 P.2d at 1050.

The evidence in favor of the State, together with the reasonable inferences therefrom, is sufficient to establish the elements necessary for aggravated assault.

■ But appellant Bobich contends that such evidence is not directed at him. He

---

4. The acquittal of Miss Harper made unnecessary an appeal by her. We were not called upon to determine whether or not her actions were sufficient to sustain a verdict of guilty.

points to the evidence which placed the first knife in appellant Edge's possession when the trailer was entered and to the fact that all of the conversation with the police was by appellant Edge. The jury was instructed with reference to § 6–1–114, W.S.1977, which provides:

"Every person who shall aid or abet in the commission of any felony, or who shall counsel, encourage, hire, command, or otherwise procure such felony to be committed, shall be deemed an accessory before the fact, and may be indicted, informed against, tried and convicted in the same manner as if he were a principal, and either before or after the principal offender is convicted or indicted or informed against; and upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal."

Appellant Bobich was associated with appellant Edge throughout the entire escapade. They entered the trailer together. They "taked" Mr. Carrier to the back room. The negotiations were carried on for both of them. It isn't necessary to prove that each of them did that necessary to establish each element of the offense. It is sufficient to show that they were associated together in doing that which comprises each element of the offense. *State v. Thompson*, 253 Or. 430, 452 P.2d 754, reh. denied 455 P.2d 179 (1969); *Goldsmith v. Cheney*, 447 F.2d 624 (10th Cir. 1971); *Jones v. State*, Wyo., 568 P.2d 837 (1977); *Hawkes v. State*, Wyo., 626 P.2d 1041 (1981); *Jacobs v. State*, Wyo., 641 P.2d 197 (1982).

### KIDNAPPING

Appellants also contend that the trial court erred in denying appellants' motions for judgment of acquittal on the charge of kidnapping arguing that there was insufficient evidence of asportation or of "ransom or reward" for the case to go to the jury.

At common law the taking of a person out of his own country was required as an element of the crime of kidnapping. 51 C.J.S. Kidnapping § 1, p. 490; 1 Am.Jur.2d Abduction and Kidnapping § 1, pp. 160–161. Wyoming's early statutory definitions of kidnapping also contained an asportation requirement. Revised Statutes of Wyoming 1899, § 4962. However, in 1935 Wyoming adopted its present and much broader definition of kidnapping. Ch. 85, § 1, S.L. of Wyoming 1935 (see footnote 2).

■ Section 6–4–201, W.S.1977, makes it illegal for a person to "seize" or "confine" "and hold or detain any person, for ransom, reward, or robbery." Asportation or the transporting of the person is but an alternate means of committing the crime.

Appellants argue that the asportation requirement is necessary to avoid the possible elevation of a lesser crime to kidnapping. False imprisonment was referred to as an example of such. However, the purpose of false imprisonment is not for ransom or reward. If it should be, then, properly, kidnapping has resulted. Appellants do not point to another crime which has the same elements as does kidnapping.

■ Appellants also contend that there was insufficient evidence on the element of ransom or reward. Reward can consist of freedom from arrest,[5] obtaining prescription drugs, publicity, etc.[6] However, appellants cite no authority and do not present cogent argument in support of the contention that appellants' actions were not for reward. Accordingly, we will not further consider the contention. *Weddle v. State*, Wyo., 621 P.2d 231 (1980); and *Cherniwchan v. State*, Wyo., 594 P.2d 464 (1979).

Affirmed.

ROSE, Chief Justice, concurring in part and dissenting in part.

I concur in that part of the majority opinion which upholds the appellants' con-

---

5. "To escape physical arrest, or to attempt to do so, as the defendant did here, is within the broad definition of 'reward.'" *State v. Aleck*, 10 Wash.App. 796, 520 P.2d 645, 649 (1974), cert. denied 420 U.S. 937, 95 S.Ct. 1146, 43 L.Ed.2d 413 (1975).

6. The United States Supreme Court has defined reward as "something given in return for good or evil done or received." *Gooch v. United States*, 297 U.S. 124, 126, 56 S.Ct. 395, 396, 80 L.Ed. 522 (1936).

victions for kidnapping under § 6–4–201 W.S.1977 because the statute no longer requires "asportation" as an element of the crime of kidnapping, and because the record reflects evidence (even though conflicting) [1] that the defendants sought "ransom" or "reward" for the safe return of their captive. I cannot, however, agree with the part of the opinion which upholds the convictions for aggravated assault, that is, assault with a deadly weapon, under § 6–4–506(b), W.S.1977,[2] because, in my judgment, the state failed to prove a necessary element of that crime. I would have reversed the convictions for aggravated assault with a deadly weapon because there is insufficient evidence of attempted battery.

### ATTEMPTED BATTERY

#### The Law

In *Brightwell v. State*, Wyo., 631 P.2d 1048 (1981), we summarized the elements that are necessary to sustain a conviction under § 6–4–505(b) when we said that these elements are:

"* * * the unlawful attempt with unlawful intent (maliciously) to commit a violent injury (attempted battery) upon the person of another, with the use of a deadly weapon in that attempt and the apparent ability to accomplish that injury." 631 P.2d at 1050.

We said, in *Brightwell*, that one of the necessary elements of the crime of aggravated assault with a deadly weapon under § 6–4–506(b) is that the state must prove an "attempted battery." This requirement was discussed in *Evanson v. State*, Wyo., 546 P.2d 412 (1976) where we held that the definition of "assault," found in § 6–4–501

W.S.1977,[3] must be incorporated into § 6–4–506(b) when defining the elements of assault with a deadly weapon. The "including an unloaded firearm" language was inserted into § 6–4–506(b) in 1975 and therefore the "present ability" language of § 6–4–501 must be read as "apparent ability." See *Brown v. State*, Wyo., 590 P.2d 1312 (1979).

We said in *Brown v. State*, supra, that the rule in

"* * * this statute now appears to be directed at the effect upon or the apprehension of the victim of the assault."

We then went on to say:

"This adopts the rule which has been denominated in some jurisdictions as a 'show of violence rule' mentioned in *State v. Sawyer*, 28 N.C.App. 490, 221 S.E.2d 518, 520." 590 P.2d at 1315.

The *Sawyer* case to which we referred holds:

"*Under the common law, the test for simple assault requires an overt act or an attempt with force and violence to do some immediate physical injury to the person of another.* More recently, in some cases of assault, North Carolina has adopted as an alternative the 'show of violence' rule which requires a reasonable apprehension on the part of the assailed witness of immediate bodily harm or injury which caused him to engage in a course of conduct he would not have otherwise followed." (Emphasis added.) 221 S.E.2d at 520.

We held that we had not abandoned the common-law test when we considered the effect of the unloaded-firearm amendment to § 6–4–506(b) in *Brightwell*, supra, when we said:

---

1. The alleged victim Carrier was with the defendants in a small room in a trailer house for the entire episode and was asked:
   "Did you ever hear them tell the police they were going to hurt you if they [the police] didn't corporate [sic]?
   "A. I never heard that."

2. Section 6–4–506(b) provides:
   "(b) With dangerous weapon.—Whoever, while armed with a dangerous or deadly weapon, including an unloaded firearm, maliciously perpetrates an assault or an assault

and battery upon any human being, shall be fined not more than one thousand dollars ($1,000.00), or be imprisoned in the penitentiary not more than fourteen (14) years, or both."

3. Section 6–4–501 W.S.1977 reads:
   "Whoever, having the present ability to do so, unlawfully attempts to commit a violent injury on the person of another, is guilty of an assault and shall be fined in any sum not exceeding fifty dollars ($50.00)."

"In *Brown v. State*, Wyo., 590 P.2d 1312 (1979), we were called upon to decide the effect of the 'including an unloaded firearm' language in § 6–4–506(b), supra, which had been added to § 6–70B, W.S. 1957, in 1975 and thus made an element of our aggravated-assault law. In that case, we determined that the effect of the amendment was to change the 'present ability' element in § 6–4–501, supra, to that of 'apparent ability.' Id., 590 P.2d at 1315. *We did not find that the added language was intended by the legislature as an adoption of a second type of assault. In Fuller v. State, Wyo., 568 P.2d 900, 904 (1977), we stated that '[b]y its statutes, Wyoming has limited criminal assault to attempted battery.' Our decision in Brown did not change this.* Thus, even though the trend in the law of criminal assault is to punish not only the attempted-battery type but also the intentional-apprehension-of-fear type, which is more in the nature of the tort concept of assault, the Wyoming legislature has not yet adopted this latter approach." (Footnote omitted and emphasis added.) 631 P.2d at 1049.

It therefore also follows that this court has not adopted the tort concept of civil assault in criminal cases where it is said that attempted battery

"' * * * is committed when one, with intent to cause a reasonable apprehension of immediate bodily harm (though not to inflict such harm), does some act which causes such apprehension. * * *'" See Justice Thomas' specially concurring opinion in *Brightwell v. State*, supra, 631 P.2d at 1051.

and we have not adopted the show-of-violence rule discussed in *Brown v. State*, supra, insofar as such a rule would relieve the state of proof of a common-law assault—i.e., an attempted battery.

---

**4.** See also *Fuller v. State*, Wyo., 568 P.2d 900 (1977) where defendant had fired a shotgun at a moving patrol car and we held the evidence was sufficient to sustain the conviction.

Prior Case Law:

The Gun Cases

In *Shafsky v. State*, Wyo., 526 P.2d 60 (1974), when the rule was "present ability" instead of "apparent ability" as it is now (*Brown v. State*, supra), we sustained appellant's conviction for assault with a deadly weapon—i.e., that it was an attempt to commit a violent injury in circumstances where the defendant held a gun directly against a police officer's stomach, even though it was later determined that the gun would not fire because of a faulty ammunition clip. Similarly, in *Evanson v. State*, supra (another "present ability" case), we upheld a conviction for assault with a deadly weapon where the defendant had pointed a handgun at a deputy sheriff and pressed the trigger even though the gun did not fire because of a malfunction. Then, in *Brown v. State*, supra (an "apparent ability" case), we upheld another aggravated-assault conviction where the defendant had pointed a sawed-off .22 caliber rifle at a police officer which, upon being grabbed by the officer, discharged but did not strike him.[4] As can be seen, most of our past appeals involving challenges to a conviction for assault with a deadly weapon involved the use or attempted use of a firearm, and in these cases, we have never regarded the inoperability[5] of the firearm as sufficient to defeat the charge, and the malicious and threatening pointing of the weapon has in all cases been sufficient to establish that an attempted battery had occurred. In other words, we held that the threatening (malicious) pointing of a firearm at a person in circumstances where injury could occur constitutes the apparent ability to accomplish the injury and *is an attempted battery*.

Cases Involving Weapons Other Than Guns

It was not until *Brightwell v. State*, supra, where the alleged deadly weapon was a knife, that we were confronted with a case involving the attempted-battery question

---

**5.** Of course, the inoperability of a firearm is no longer important in light of the 1975 amendment to § 6–4–506(b) (former § 6–70(B)) discussed in *Brown v. State*, supra.

where the defendant was charged with assault with a deadly weapon and a firearm was not involved. We sustained appellant Brightwell's conviction for assault with a deadly weapon because we found that the threatening of the victim together with the placing of her arm around his neck "in a rude and threatening manner," while pointing a knife a few inches from his ribs, was sufficient to conclude that the defendant had the "apparent ability" to inflict injury and had therefore attempted a battery—that is she had, in point of fact, committed an "assault with a deadly weapon" under § 6–4–501, supra. In reviewing the evidence we said:

> "The final element which must be satisfied concerns the attempted-battery requirement. The appellant contends that there was no evidence adduced at trial that she attempted a battery upon the person of Mr. Emerson. In her brief she correctly stated that at no time did she swing the knife or attempt to use it upon Mr. Emerson. Mr. Emerson also testified that the appellant never injured him physically. However, the appellant in this case would have this court hold that in order for her to have committed an assault she would in fact have had to stab Mr. Emerson. In *Evanson*, supra, 546 P.2d at 416, we stated that in order to commit an assault with a deadly weapon, actual injury need not be inflicted. Appellant would require in this case that Mr. Emerson had in fact been injured. It seems very likely that had Ms. Brightwell attempted to stab Mr. Emerson she would have injured him, considering the fact that the knife was only inches from his body and the fact that his movement was restricted by her arm around his neck. When appellant placed her arm around Mr. Emerson's neck, she actually touched him in a rude and threatening manner. She indicated that he could avoid injury from use of the knife only on condition that he comply with her directions. *This was an attempted battery.* In conclusion,

> *we hold that when a knife is held in a threatening manner only inches from a person's body, an attempted battery has occurred."* (Emphasis added.) *Brightwell v. State*, supra, 631 P.2d at 1050.

We therefore said in *Brightwell* that the attempted battery necessary in the assault-with-a-deadly-weapon statute (§ 6–4–506(b)) could be committed in circumstances where a gun was not involved and the weapon that *was* utilized did not in fact touch or harm the victim. I would suggest the rule of *Brightwell* to be that, for all purposes contemplated by § 6–4–506(b), an attempted battery is committed where—even though there is no touching or injury by reason of the utilization of a weapon other than a firearm—the weapon (knife) is nonetheless presented in close physical proximity to the victim in a threatening manner and in circumstances where the defendant has the apparent ability to carry out his threats of injury or harm.

In sum, the rule in this state continues to say that, even though an attempted battery may be proven by showing "apparent ability" instead of "present ability" to commit the assault with a dangerous weapon, nonetheless, the State must prove the attempted battery, i.e., an unlawful *attempt* with unlawful *intent* to commit a *violent injury* with the use of a *deadly weapon.*

The State of Wyoming has not carried its burden of proof in this case.

The majority opinion says the following with respect to attempted battery:

> "Carrier testified that he saw a butcher knife in the hands of one of the appellants when they entered his trailer and that they took another butcher knife off the table in the trailer. He said that they 'taked me to move in the back room.' They kept him in the back room with them during the negotiations. Carrier asked the police to do as appellants asked or they would kill him. Appellants told the police several times that they would kill him if the demands were not met.[6]

---

**6.** The victim heard no such threats (n.1, supra), but, in any case, the defendants did not threat-

en Mr. Carrier with the knives—nor did they

"As in *Brightwell*, the knives in the hands of appellants were deadly weapons. Appellants had the 'apparent ability' to commit violent injury of Mr. Carrier, a 74-year-old man who had trouble walking and who they 'taked * * * to move in the back room' with them and held there. As in Brightwell, the intent to commit violent injury upon Mr. Carrier can be 'inferred from the conduct of * * * [appellants] and from circumstantial evidence.' Appellants threatened to kill him. They 'taked' him with them into the small room which they barricaded against police action. Again, as in *Brightwell,* the attempted battery requirement was present. There was no attempt to use the knife (as in *Brightwell*). Appellant was not physically injured (as in *Brightwell*). Mr. Carrier was in a small room with appellants, unable to walk very well, at age 74, and able to avoid injury only if the police acceded to the conditions imposed by appellants. In *Brightwell*, we said:

"'* * * She [Brightwell] indicated that he could avoid injury from use of the knife only *on condition* that he comply with her directions. * * *' (Emphasis in original.) 631 P.2d at 1050.

"The evidence in favor of the State, together with the reasonable inferences therefrom, is sufficient to establish the elements necessary for aggravated assault."

The above is hardly sufficient to support the attempted battery under *Brightwell*.

If the *Brightwell* analogy is to be utilized to hold that the State proved an attempted battery, the majority is forced to infer from the facts of record that, at the time the defendants escorted Mr. Carrier to the bedroom of his trailer,[7] they each had knives in their possession and (as in *Brightwell*) they touched Mr. Carrier in a "rude and threatening" manner and pointed knives in his direction in order to compel his movement into the bedroom. Such facts as these do not appear in the record and it stretches imagination beyond comprehension for the majority to undertake to infer that the facts that are of record will support such conclusions. Especially is this so when the victim's testimony is taken into account, as will be shown infra.

Our prior decisions have required proof that the defendant in fact committed an attempted battery. Inferences have never before been authorized to substitute for the proof of facts in lieu of the state's obligation to discharge its burden of proof. In *Brightwell v. State*, supra, the case upon which the majority so heavily relies, there was an *actual touching* (the arm around the victim driver), *close proximity of the dangerous instrumentality* (*knife*) *to the victim* (*three or four inches*), *and threats by the defendant directed to the victim to the effect that she needed money and that she was serious* ("*I mean business*"). We held that the touching accompanied by threat fortified by a knife held at the victim's ribs constituted an attempted battery as a matter of fact and law—and we did not find it necessary to resort to inferences in order to so hold. Since we have always required proof of attempted battery I do not know of any authority emanating from this court which now permits us to utilize inference founded upon fantasized facts to substitute for proof of the attempted battery.

### The Facts

The State is simply unable to point to any acts of the defendants with respect to their relation with the victim that can be construed as an "unlawful attempt" with "unlawful intent" (malicious intent) "to commit a violent injury with a deadly weapon" upon the person of Mr. Carrier. There was no such attempt. The most that can be said or inferred is that the two defendants were in possession of knives while in the presence

---

indicate such threats through their conversations with the police.

7. The majority opinion refers to the witness' statement that the defendants "taked me to move in the back room."

of Mr. Carrier. There is no evidence in this record that they undertook to utilize them against him by threat or action of any kind whatsoever.

What did the defendants do that will, when tested against the rules established by this court, constitute the unlawful attempt to injure that the law requires before an assault with a deadly weapon will be said to have been committed?

The evidence shows that when the appellants entered the trailer, one of them (appellant Edge) was carrying a butcher knife and only possibly is it sufficient to establish that soon after entering the other codefendant (appellant Bobich) picked up a butcher knife belonging to the victim Carrier. Carrier testified that when he observed the knife held by Edge, as he came in the front door, he and defendant Edge were some eight or ten feet apart. After that, the testimony reflects that all three went into the bedroom of the trailer but there is no evidence to the effect that the appellants ever attempted to assault Mr. Carrier or in any way threatened him with the knife. There is no indication that the defendants pointed the knives at Carrier—that they brandished the knives in his presence—that he was afraid of either the knives or the defendants—that he went to the bedroom with the defendants at knife-point or that he was being threatened or had been threatened by the knives when the police testified that Carrier said the police had best comply with the demands of the defendants or he would be killed. The police witness said that while in the bedroom for some two-and-one-half hours, and negotiations between the defendants and the police were going on, the defendants threatened the victim's safety, but Mr. Carrier testified that while in the bedroom with the defendants he did not hear any such threats and did not ever recall even seeing the knives.

In point of fact the inferences relied upon by the majority (to show malicious intent to commit a violent injury) are contradictory to the direct testimony of the victim. With respect to this situation, we said in *Nunez v. State*, Wyo., 383 P.2d 726, 729 (1963):

"Inferences contrary to direct testimony are not ordinarily sufficient to support a finding [citing *National Labor Relations Board v. Kaye*, 7 Cir., 272 F.2d 112, 114; and *Waller v. Northern Pacific Terminal Co. of Oregon*, 178 Or. 274, 166 P.2d 488, 496–497, certiorari denied 329 U.S. 742, 67 S.Ct. 45, 91 L.Ed. 640, rehearing denied 329 U.S. 825, 67 S.Ct. 181, 91 L.Ed. 701.]

"Hence, in the absence of concrete evidence on the part of the state to show intent, * * * there can be no presumption of law on intent."

The real flavor of this case and the flights of fantasy that the majority relies upon to constitute the necessary inferences, can only be appreciated after a review of the relevant testimony:

"A. Well, those two men come, opened the door taked me to move in the back room.

"Q. What were they carrying?

"A. I saw one—he had a knife. I saw just the blade because it was shiney [sic] but he had that in his hand like that.

"Q. What did he say to you?

"A. Nothing. One said come in the back room. That's all.

"Q. What did they tell you was going to happen if you didn't do it?

"A. They didn't—they didn't tell me nothing.

"Q. Which one had the knife?

"A. I think it's the blonde one.

"Q. How close to you was he?

"A. Oh, maybe eight, ten feet—eight feet maybe.

"Q. What kind of a knife was it?

"A. I don't know. I just saw the blade.

"Q. Was it a pocket knife?

"A. Butcher knife.

\*     \*     \*     \*     \*     \*

"Q. You had a knife on your table?

"A. Yes.

"Q. And they took that?

"A. Yes.

"Q. And then you all went to the back room?

"A. Yes.

"Q. How long were they in your trailer, Mr. Carrier?

"A. Around two and a half hours.

"Q. Did you remain in the back room with them all that period?

"A. Yes.

"Q. What happened while you were in the back room?

"A. Oh, they were talked to me nice but they put the mattresses in the window and he put the springs in the other one and I couldn't see out.

  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

"Q. Were you scared?

"A. No.

"Q. Well, at first were you scared?

"A. Oh, at first I don't know. Sure, but I found out right away and I wasn't scared at after all.

"Q. After the first?

"A. After a few minutes, he said we ain't going to hurt, you don't worry.

"Q. Which one said that?

"A. Oh, I don't know that little—the blonde, I guess. The other one never did talk at all.

  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

"Q. When these two men came into your trailer, you say one man was holding a knife?

"A. Yes.

"Q. Did he take that knife and hold it up to you and put it to your throat or anything?

"A. No.

"Q. Did he swing the knife at you in any way?

"A. No.

"Q. Did he tell you he wasn't going to hurt you?

"A. No. He told me I ain't going to hurt you.

"Q. He told you he wasn't going to hurt you?

"A. Yes.

"Q. Did he say that to you just one time or a couple times?

"A. No. A couple times. One in the bedroom, too.

"Q. What did you think about these guys? Were they mean to you?

"A. No.

"Q. How did they treat you?

"A. All right. Nice.

"Q. Did you do anything with them while you were in the trailer?

"A. Do something with those?

"Q. Did you drink a beer with them?

"A. Yes. The blonde one asked me—he says, have you got something to drink? I said, I don't know; go look in the icebox; maybe you find some. He went up and he got two cans and he gave me a can and I said thank you. He opened one and said thank you for my beer. He said don't worry we're not going to hurt you.

"Q. He gave you one beer and took one for himself?

"A. Yes.

"Q. Did he drink one beer or a couple?

"A. Just one beer. That's all I had.

"Q. Just drank one beer, too?

"A. Yes, and that was all right to me.

"Q. Were you afraid of these men?

"A. No.

"Q. Did you ever think they were going to hurt you?

"A. No.

"Q. Did they have the knife with them the whole time they were in the back room?

"A. *I never seen no knife. I don't know if he put that on the floor. I never seen no knife.*

"Q. *So, after he came in the trailer, you never saw the knife after that?*

"A. *No.*

"Q. Did they ever tell you they were going to hurt you if you didn't corporate [sic] with them?

"A. No.

"Q. When you were with these two men the entire time they were in the back room with you, right?

"A. Pardon me?

"Q. You were with these two men the whole time they were in the trailer?

"A. Yes.

"Q. Did you ever hear them tell the police they were going to hurt you if they didn't corporate [sic]?

"A. I never heard that.

"Q. And you were with them about two and a half hours?

"A. Yes.

  \*     \*     \*     \*     \*     \*

"Q. Did you ever feel while the you were in this trailer house that these two men did not like you?

"A. No.

"Q. Do you think they liked you?

"A. Well, I don't know. They were all right to me.

"Q. Did you find that this day kind of added a little excitement to your dull life?

"A. No. Just as I soon as I saw those come in the door but after they went in I went in the back.

"Q. So it didn't bother you they were in your trailer afterwards?

"A. No.

  \*     \*     \*     \*     \*     \*

"Q. Good day, Mr. Carrier.

"A. Hello.

"Q. Mr. Carrier, you said a lot about the blonde one. There were two men, were there not?

"A. Yes.

"Q. What color hair did the man have?

"A. Brown. The face pretty brown, too.

"Q. He was dark?

"A. Oh, yes.

"Q. When they came into the trailer, did the man with the dark hair have a knife?

"A. No.

"Q. Did the man with the dark hair ever say anything to you that you remember?

"A. No. He never talk.

"Q. Never talked. He didn't threaten you?

"A. No.

"Q. He didn't tell you he was going to hurt you in any way?

"A. Nothing." (Emphasis added.)

Keeping in mind that we are concerned with whether or not the defendants "maliciously perpetrated" an assault upon Mr. Carrier—the victim—and remembering that in order to show this we have to prove an *attempted battery*, it might be well to compare the facts of *Brightwell* and the facts of this case:

| FACTS: | BOBICH: | EDGE: | BRIGHTWELL: |
|---|---|---|---|
| Touching: | None | None | Defendant's arm around victim |
| Weapon: | Knife [8] | Knife | Knife |
| Threats: | None [9] | None (supra, n. 6) | Knife a few inches from victim's body and saying "I mean business" |
| Distance between weapon and victim: | No evidence | 8 – 10 feet with no threat | 3 inches at time of touching and threat |
| Victim's apprehension or fear of defendant: | None | None | No indication of fear on the part of the victim in the opinion of the Brightwell case |
| Pointing of weapon at victim: | None | None | Weapon pointed at victim's ribs 3 inches away when threats were made |

There was insufficient evidence to support the guilty verdict for aggravated assault with a dangerous weapon. I would have reversed this conviction while voting to affirm the kidnap conviction.

8. Bobich had no knife when they came out of the trailer, although he may have picked up the butcher knife which the victim had in the trailer for household purposes. The evidence is certainly not clear as to whether he ever had a knife while he was in the trailer in the presence of Carrier. At least Carrier did not know whether or not Bobich had a knife.

9. The victim who was with the defendants in the back room of the trailer testified that he did not hear the defendants say to the police that they would harm the victim if the police did not comply with their requests. The police testified there were such threats—but even *they* did not suggest that the defendants threatened to harm Mr. Carrier with the alleged "dangerous weapons"—the knives.